[Civ. No. 22442. First Dist., Div. Three. Feb. 27, 1967.]

SHARON GARDNER, a Minor, etc., Plaintiff and Respondent, v. CITY OF SAN JOSE, Defendant and Appellant.

Ferdinand P. Palla, City Attorney, Sedgwick, Detert, Moran & Arnold, Hoge, Scott Conley and Fenton, Jones & Appel for Defendant and Appellant.

Hilton J. Melby, City Attorney (Oakland), Kenneth W. Hoagland, City Attorney (Bakersfield), Harold A. Irish, City Attorney (Ukiah), Earl D. Murphy, City Attorney (Redding), Donald E. Olsen, City Attorney (Culver City), and M. Tellefson as Amici Curiae on behalf of Defendant and Appellant.

Boccardo, Blum, Lull, Niland, Teerlink & Bell, Edward J. Niland and David S. Lull for Plaintiff and Respondent.

DEVINE, J.*—The City of San Jose appeals from judgment upon a verdict in amount $90,000. The amount would have been $100,000 but the jury was instructed that if the verdict were for plaintiff, they should deduct $10,000 which had been paid by the insurance carrier for another defendant, Joanne Mitchell, the full amount of Mrs. Mitchell's policy. Mrs. Mitchell was the driver of an automobile which struck plaintiff, Sharon Gardner, while she was crossing Naglee Avenue in a crosswalk. Plaintiff's action against the city is grounded on asserted dangerous condition of public property.

Plaintiff, a 15-year-old girl, was walking home from a football game of her high school in November 1961. She was accompanied by two boy students. When they came to the intersection of Dana and Naglee Avenues, it was late in the afternoon and very dark; illumination at the intersection was

---

*Assigned by the Chairman of the Judicial Council.

poor. Naglee is a heavily traveled street. The city had built a pedestrian subway under it more than 20 years earlier. Arterial stop signs governed vehicles entering Naglee from Dana, and pedestrian lanes were marked on Dana. No stop signs limited vehicular traffic along Naglee, and no crosswalks were painted over that street.

Plaintiff could not testify to the facts leading up to the accident, since she suffered a severe brain injury which resulted in a retrograde amnesia. The boys testified that the three minors did not go to the subway, but crossed Naglee Avenue on the surface. Plaintiff walked between the two boys. The one to her left looked to his left and right before starting across, thought it was safe to proceed, looked to his right again when about halfway across, saw the car "at a distance" not "real, extremely close yet," kept on walking, but just before the accident happened saw that the car was bearing right down on the three, and stopped. Sharon, the plaintiff, took one step ahead of the others and was struck. The boy on plaintiff's right looked both ways before he stepped off the curb, but did not notice the car approaching until the last division line. He had been looking down. He stopped and the car passed directly in front of him, striking his hand as it passed. He had thrown his arm up to try to stop Sharon.

Joanne Mitchell, the driver of the vehicle, had turned into Naglee Avenue one block from the accident. She did not see the pedestrians until the moment of the impact. She did not put on her brakes before the impact. Although her brakes actually were defective, as shown by a test made by the police, this would not seem to have had causal connection because the driver had not seen the pedestrians. She had her lights on, but she testified that the area was poorly illuminated. She was going about 20 miles an hour.

The above is a general statement of the facts; the more particular facts connected with each of the steps upon which liability of the city is reached are given under appropriate headings.

### Facts and Law Relating to the Condition of the Area and of the Subway

The first factual issue at trial was whether the lights in the subway were on. Four witnesses testified that they had observed that the subway was not illuminated on the evening of the accident. The first of these made the observation while the plaintiff was still lying in the street, and the last, about

four hours later. The city produced evidence about its practices relating to replacing burned out lights, and testimony of witnesses who at other times had seen the subway to be lighted. But the city concedes on appeal that this court must accept it as a fact that the subway was unlighted. There was also evidence that the city should have known of the unlighted condition of the subway. On the evening before the accident, James Fisher, a student, had used the subway. It was unlighted. Another witness had gone by the subway in the evening about twice a week for several months before the accident, and there were never any lights in the subway; a third witness testified that there were no lights in the subway before the accident.

There was also testimony from the boys who accompanied Sharon, that on other occasions there had been obscene writings on the walls of the subway and that there was a continual stench of urine. This condition of the subway had been a matter of discussion at PTA meetings with the city's traffic analyst, in relation to the fact that many school children were not using the subway. It is to be inferred from the testimony that the condition of the subway was the reason the boys did not use the subway. But their rejection of the subway was habitual. Neither of the boys noticed whether the subway was illuminated on the night of the accident.

There can be little doubt, although the city argues to the contrary, that the subway, when unlighted, could be found by the jury to be dangerous. (The judge had instructed the jury that in order to find the city liable, the jury must find the subway to have been in a dangerous condition.) The fact that when one entered the unlighted subway one could see some illumination from the street lights, as the student Fisher, a football player, had done who went through the subway on the previous evening, does not show the place to have been safe. For a girl clad in Bermuda shorts, as Sharon was, to have descended into the subway, which by photographs is shown to be a narrow tunnel, might well have been regarded foolhardy, even if she were accompanied by two boys. If a mishap had occurred, probably the charge would have been made that she was negligent in making such a choice.

Although it was necessary, under the court's instructions, for the jury to find that the subway was dangerous, it is not necessary in order to affirm the judgment that the danger be confined to conditions within the underpass. The danger may reasonably have been found to extend to the adjacent

area, the street. In *Jones* v. *City of South San Francisco,* 96 Cal.App.2d 427 [216 P.2d 25], it was held that liability might be established where the city negligently permitted a large pool of water to exist on the sidewalk and part of the street, forcing pedestrians to the midde of the street. The pool of water itself may not have been dangerous at all, but the whole situation may well have been. (In the *Jones* case, nonsuit was reversed.)

This brings us to the questions: What was there about the street which was particularly dangerous? What is there to show that the condition of the subway had anything to do with plaintiff's choosing to use the surface crossing?

### Dangerous Condition of the Street

That there was considerable peril for pedestrians to cross the intersection on Naglee and Dana Avenues was recognized by the city by the very fact that it went to the trouble and expense of building the subway. Having constructed the subway, the city, it seems, relied considerably on its existence as protection for pedestrians. The city did not cause the crosswalk to be marked, despite the heavy traffic on Naglee Avenue. The illumination of the crossing, according to two witnesses, was poor. The city placed no warning or yield signs to pedestrians. Although section 830.4 of the Government Code provides that a condition of public property is not a dangerous one *merely* because of the failure to provide regulatory traffic control signals, the absence of such signals for the protection of pedestrians must be taken into consideration, together with other factors. It is a logical inference, which the jury no doubt drew, that the condition of the intersection was allowed to remain as it was because of the existence of the subway. But the lack of crosswalk markings, better illumination and warning signs became important factors in the case when the subway itself was in a dangerous condition. Although the city need not have provided a subway, once it had done so it was bound to see to it that the condition of the subway would not become such that, in combination with other factors within the city's control, a dangerous condition would be created. (*Dudum* v. *City of San Mateo,* 167 Cal.App. 2d 593, 596 [334 P.2d 968]; *Raymond* v. *Paradise Unified School Dist.,* 218 Cal.App.2d 1, 6-9 [31 Cal.Rptr. 847]; *Teall* v. *City of Cudahy,* 60 Cal.2d 431 [34 Cal.Rptr. 869, 386 P.2d 493].)

But a more particular peril than those mentioned in

the preceding paragraph arises from the existence of a dangerous condition of the subway. It is the matter of right-of-way. We shall discuss below the effect of right-of-way as related to the conduct of plaintiff, but at this point we discuss it in respect of the driving by Mrs. Mitchell. We believe it can be demonstrated that the jury may have reasoned logically that there had been created a ''trap'' situation in that both parties, driver and pedestrian, had seemingly been given the right-of-way. Ostensibly, Mrs. Mitchell had the right-of-way, because section 21953 of the Vehicle Code provides: ''Whenever any pedestrian crosses a roadway other than by means of a pedestrian tunnel or overhead pedestrian crossing, if a pedestrian tunnel or overhead crossing serves the place where the pedestrian is crossing the roadway, such pedestrian shall yield the right-of-way to all vehicles on the highway.'' Mrs. Mitchell could assume that the subway was in good condition. To be sure, there is no testimony by Mrs. Mitchell that she gave thought to the right-of-way. Unless she had seen the pedestrians, probably she would have no recollection of having adverted mentally to right-of-way. But right-of-way is an intangible which accompanies its possessor. Indeed, the city recognizes this, for it says in its opening brief: ''Certainly Mrs. Mitchell could not have known of the condition of the subway and that her duties would change as those conditions changed.'' It is true that she was bound to exercise vigilance at all times (*Westcott* v. *Hamilton,* 202 Cal.App.2d 261, 267-268 [20 Cal.Rptr. 677] ; *Bergman* v. *Bierman,* 138 Cal.App.2d 692, 696-697 [292 P.2d 623] ), and that the fact that she had the right-of-way would not excuse her from the duty of ordinary care (*Woods* v. *Eitze,* 94 Cal.App.2d 910, 917 [212 P.2d 12] ). No doubt (as her insurance carrier evidently recognized) a jury would find that she had failed in this duty. But the city, by constructing the subway, had nevertheless given to the driver the right-of-way during the time in which the subway actually served the pedestrians, and the driver was entitled to take this into consideration as she proceeded along Naglee Avenue. In fact, the whole flow of traffic along Naglee Avenue no doubt was intended to be expedited by the subway. Marked crosswalks were not provided at the intersection. Stop signs halted the traffic about to enter Naglee Avenue, but there were no stop signs against Naglee traffic. Drivers on Naglee were not exonerated from care and vigilance, but they were relieved of the duty of yielding the right-of-way at the crosswalk. What constitutes a dangerous condition must depend

upon a set of facts in each particular case and, as a general rule, it is a question for the jury to determine whether a given set of facts constitutes a dangerous condition. (*Irvin* v. *Padelford,* 127 Cal.App.2d 135, 140 [273 P.2d 539].)

We turn now to the subject of right-of-way as related to the plaintiff. Vehicle Code section 21953 gives the driver the right-of-way at an intersection where a subway "serves" the place where the pedestrian is crossing the roadway. We have no doubt that a subway which is in a dangerous condition cannot be said to "serve" the place. It serves nothing but confusion. There is an analogous situation in *Brown* v. *Regan,* 10 Cal.2d 519 [75 P.2d 1063], where it was held that traffic could not be deemed "controlled" by signals where there was no evidence that the signals were in operation at the time of the accident, which was at 1:45 a.m., and that therefore a pedestrian could not be held guilty of contributory negligence as a matter of law in crossing at a place other than in a cross-walk. Such conduct by a pedestrian would, in case the traffic was "controlled," be forbidden by section 131½, subdivision (d) of the California Vehicle Act (Stats. 1931, ch. 1026, p. 2127), now Vehicle Code section 21955.

Because the subway was dangerous and did not serve the place, pedestrians were entitled to rely on the ordinary rule of right-of-way at a surface crossing. They were entitled to assume that while they were in the crosswalk approaching vehicles would yield the right-of-way. The intersection there-fore became similar to one in which the signals both ways become stuck on the green light. (*Teall* v. *City of Cudahy,* *supra,* 60 Cal.2d 431, 434; *Bady* v. *Detwiler,* 127 Cal.App.2d 321 [273 P.2d 941].) Both parties, pedestrian and driver, having been given the apparent right-of-way (although the actual right belonged to plaintiff alone), the intersection be-came a trap.

In fact, even if the pedestrian alone had been deceived, the trap situation would have existed through the city's negli-gence.

### Proximate Cause

■ Preliminarily, we observe that a dangerous condition created by a public entity may be the proximate cause of an injury, even though the negligent act of another person has concurred in producing the injury. (*Irvin* v. *Padelford,* *supra,* 127 Cal.App.2d 135, 141; *Chavez* v. *County of Merced,* 229 Cal.App.2d 387, 395-396 [40 Cal.Rptr. 334]; *Hinton* v.

806

*State of California,* 124 Cal.App.2d 622 [269 P.2d 154]; *Bauman* v. *City & County of San Francisco,* 42 Cal.App.2d 144, 154 [108 P.2d 989].)

█ Appellant argues that there is nothing to show that Sharon observed the unlighted condition of the subway and that because of this condition she chose to use the surface crossing; wherefore, the lack of illumination could not have been a proximate cause of her injury. But there is such evidence, namely, the presumption which existed at the time of the accident (it has not existed since the adoption of the Evidence Code) created by Code of Civil Procedure section 1963, subdivision 4: "That a person takes ordinary care of his own concerns." Plaintiff, having suffered the loss of memory, is entitled to the full effect of this presumption. (*Scott* v. *Burke,* 39 Cal.2d 388 [247 P.2d 313]; *Kumelauskas* v. *Cozzi,* 173 Cal.App.2d 541 [343 P.2d 605]; *Napoli* v. *Hunt,* 141 Cal.App.2d 782 [297 P.2d 653]; *Scott* v. *Sheedy,* 39 Cal. App.2d 96 [102 P.2d 575].) This presumption does not, of course, establish the fact that the subway was unlighted; this fact was established by other evidence. But it does provide a basis for the jury to reason that if it were negligence for plaintiff to have acted as she did had she *not* observed the condition of the subway, therefore she *did* observe it. It is presumed that plaintiff did everything that a reasonably prudent person would do. (*Orbach* v. *Zern,* 138 Cal.App.2d 178, 181 [291 P.2d 120]; *Napoli* v. *Hunt, supra,* p. 787; *Bove* v. *Beckman,* 236 Cal.App.2d 555, 558 [46 Cal.Rptr. 164].) It is presumed that Sharon, before crossing the street, made whatever observations a reasonably prudent person would make. (*Duehren* v. *Stewart,* 39 Cal.App.2d 201 [102 P.2d 784].)

█ We turn, therefore, to the question: Could the jury have found that it was negligent for plaintiff to have acted as she did without making the observation that the subway was unlighted? Two theories of negligence on the part of plaintiff have been advanced, one by amici curiae and the other by the city. The one put forward by amici is this: that the underpass "was a far safer approach to the opposite side of the street than through an unmarked portion of a main boulevard at the busy dinner hour." The choice of a more dangerous way, say amici, constituted negligence. They cite *Stricklin* v. *Rosemeyer,* 61 Cal.App.2d 359 [142 P.2d 953], which does indeed state such a rule. But the rule of the *Stricklin* case was limited to cases in which the defendant can

show that no inference other than one of plaintiff's own negligence could reasonably be drawn from the facts, in *Harris* v. *Joffe,* 28 Cal.2d 418, 427 [170 P.2d 454]. Besides mentioning this limitation, however, we observe that counsel for the city did not at the trial and do not now suggest the acceptance of the theory proposed by amici. The theory would, in fact, under the circumstances of this case, work to the disadvantage of appellant, because it would bring into play the presumption, and would produce the conclusion, that Sharon had observed the dangerous, that is unlighted, condition of the subway. We do not find the theory to be helpful to the city because of the limitation stated in *Harris* v. *Joffe,* but on the other hand, we do not regard the argument made by amici and not espoused by the city's counsel as binding upon the city in so far as it is hurtful to the city's case.

The second theory of negligence on the part of plaintiff, which was proposed at the time of trial by appellant and which is argued by the city on appeal, is that the plaintiff had the duty to yield the right-of-way and that she failed to do so. No doubt the jury could find, and impliedly did find, that Sharon in effect asserted her own right-of-way. That she actually had the right-of-way because the subway, as found by the jury, was dangerous (under the instructions, the jury could not have found for plaintiff unless they found the subway to be dangerous), has been explained above. The fact that she asserted the right-of-way tends to show that she knew it was hers. How did she know this? The jury could deduce that because it would have been negligence on Sharon's part to have failed to yield the right-of-way if it had belonged to the driver, it must be presumed that she had gained the knowledge that she had the right-of-way by seeing that the subway was unlighted. It would not have been necessary for her to have made a studied determination. If, by a glance in the direction of the subway, the girl saw that the area was dark, she could have made her own decision, independently of that made by her companions, to make the surface crossing. She could have concluded that the intersection was no different from the multitude of others at which the pedestrian has the right-of-way; and she could have proceeded, using ordinary care (which the jury found she did use, because ample instructions on contributory negligence were given). These actions would have comported with the due care for her own concerns which the law presumes she used.

It is argued by appellant that there was no testimony that

the condition of the lights could be seen from the route which the respondent and her companions took. If light from the well of the subway could not have been seen from the ordinary pedestrian route, this in itself would have been a sorry commentary upon the illumination provided by the city. How else would pedestrians unfamiliar with the area know of the underpass when it was dark? But although there was not testimony explicitly to the effect that pedestrians could see whether the entrance at least to the subway was lighted, there was ample testimony from which the jury could find that pedestrians could see the condition. The principal of a nearby school, testifying for the defense, said that the entrance lights were bright, that they "shine out" and that they could be seen as he drove in the area. There is also evidence from the photographs, and in particular plaintiff's exhibit 2-A, from which the jury might determine that the panel light on the outside wall of the subway could have been seen if it had been lit. (The large sign cautioning pedestrians to use the underpass and citing Vehicle Code section 21953, which appears in the photograph, was not on the railing of the subway entrance until after the accident and, therefore, would not have obscured the panel light from view.)

Appellant argues that the presumption of due care is only useful for the purpose of negativing negligence or contributory negligence of the party entitled to the presumption, and that it cannot be used positively for the purpose of showing proximate cause. The statute (Code Civ. Proc., § 1963, subd. 4) contains no such limitation. The presumption was not necessary in order to prove the pernicious effect of double appearance of the right-of-way. This could have been foreseen by a reasonably prudent person who turned his thoughts to it, especially by one who had any duty in the matter. The presumption served merely as evidence that plaintiff had used due care and had been given reason to believe that she had the right-of-way. It would be incongruous to split this conclusion into negative and positive effects, the first allowable, and the second not. We shall never know from her own lips whether she looked toward the subway or not. The law supplies the deficiency.

To summarize the steps leading to affirmance of the judgment: (1) The subway was unlighted (conceded by appellant for purposes of appeal). (2) The unlighted condition made the subway dangerous (impliedly found by the jury under express instruction by the court on the subject). (3) A dan-

gerous condition was produced on the street by the condition of the subway, because other precautions which might have been taken at the busy intersection were omitted, and especially because drivers were given the apparent right-of-way. (4) It is presumed that Sharon chose the surface crossing because she asserted the right-of-way, which she would not have had if the subway had served the place. (5) The situation, therefore, was a trap, because it gave the appearance to both driver and pedestrian of having the right-of-way. (6) The accident happened in the crosswalk, where the matter of right-of-way was important.

Judgment affirmed.

Salsman, J., concurred.

DRAPER, P. J.—I dissent.

To me, the insurmountable problem is the absence of any evidence that plaintiff's election to use the surface crossing was in any way occasioned by the unlighted condition of the subway.

The two boys who walked with plaintiff had no conversation with her or between themselves as to choice of routes. Neither noticed the unlighted condition of the subway on the ill-starred evening. Neither normally used the subway. One had used it a total of 5 times, none in that school year, and the other had used it less than 10 times in a calendar year. Lighting conditions were not shown to have any relation to this disuse. There is no indication that either consciously considered the subway route, and there is direct testimony that if either had done so he would have rejected it only because of possible embarrassment to plaintiff resulting from writings on the walls and the odor of urine, which fall far short of the "dangerous condition" prescribed by statute (Gov. Code, §§ 830, 835) as a condition to city liability.

It is, of course, the compulsion of or inducement to plaintiff, rather than to her companions, which is determinative. There is no testimony on this subject. There is evidence that plaintiff, three years earlier when she was in grade school, had been admonished by her mother to use the subway. But 'there is no evidence that she did use it customarily, or at all, in daylight or dark, and without regard to its lighting. Evidence that she had customarily or frequently used the subway would not be rendered unavailable by her loss of memory, but, if it were the fact, could readily be shown by testimony of

schoolmates. None was produced. Nor is there evidence that the subway was much used by high school students generally. The testimony of school and P.T.A. meetings to encourage its use warrants inference that high school student use was at best sporadic and infrequent. Like inference could be drawn from testimony that subway use was required of students of the two nearby grammar schools, but not of high school students.

But, says plaintiff, the presumption that she exercised due care (Code Civ. Proc., § 1963, subd. 4, now repealed) is evidence that she elected the surface route only because the subway was unlighted and therefore not useable. Yet that presumption is only that one "takes ordinary care of his own concerns," or, as commonly said, takes ordinary care of his own concerns and "obeys the law" (B.A.J.I. 135-A; 135-A.1). The presumption relates only to the care which plaintiff exercises for her own safety. It negates contributory negligence. As to her conduct after she embarked upon the crossing, she is entitled to and obviously has had the benefit of the presumption.

Since the sole purpose of the presumption is to negate plaintiff's negligence, it cannot have the effect urged unless her choice of the surface crossing, assuming full availability of the underpass, would constitute a lack of due care for her own safety. I find nothing to suggest such negligence. It is true that plaintiff, in using the surface crossing, was required to yield the right of way to vehicles (Veh. Code, § 21953). But this is by no means to say that the election shows negligence. The driver to whom the right of way is yielded remains obligated to exercise due care for the safety of the pedestrian, and to maintain a vigilant lookout (*Biggar* v. *Carney,* 181 Cal. App.2d 22, 28 [5 Cal.Rptr. 94]). The degree of care required is the same as to both driver and pedestrian, but even when he has the right of way the driver remains obligated to use a greater amount of care because of the greater danger from the instrumentality he controls (*Rubalcaba* v. *Sweeney,* 168 Cal. App.2d 1, 5 [335 P.2d 157]). Section 21953 does not prohibit a pedestrian's crossing on the surface. Rather, it is clearly distinguished from prohibited crossings, as between adjacent intersections controlled by signal devices (Veh. Code, § 21955), or against posted prohibition (Veh. Code, § 21106, subd. b) or against a signal (Veh. Code, § 21462). It provides only, as does the statute dealing with crossing at other than a marked or unmarked crosswalk (Veh. Code, § 21954), that one so crossing shall yield the right of way. Crossing under such cir-

cumstances does not render the pedestrian contributorily negligent as a matter of law. The determinative question remains one of fact—"whether the required care has been exercised, and not merely whether or not the right of way has been actually yielded" (*Shipway* v. *Monise,* 59 Cal.App.2d 565, 571 [139 P.2d 60]). Contributory negligence does not turn upon the pedestrian's merely embarking upon the surface crossing. Rather, it depends upon her care and watchfulness after she commences it.

Since the presumption of due care serves only to negate negligence, it cannot be extended to indicate motivation for choice of a course which is not itself negligent. Plaintiff's argument is that she must be presumed to have crossed on the surface only because the subway was impassable. But whatever merit this reasoning might otherwise have, it fails utterly unless a wholly voluntary choice of the surface crossing would have been negligent.

The presumption is but that plaintiff exercised "due care," "ordinary care," or the care of the ordinarily prudent person. It cannot be extended to supply proof that, of two nonnegligent routes, plaintiff rejected the vehicle-proof route only because she recognized and was deterred by a condition of that route. A contrary view has been expressed (*Stricklin* v. *Rosemeyer,* 61 Cal.App.2d 359, 362 [142 P.2d 953]). But it was promptly and properly held to apply only when "defendants can show that no inference other than one of plaintiff's negligence can reasonably be drawn from the facts" (*Lagomarsino* v. *Market Street Ry. Co.,* 69 Cal.App.2d 388, 392 [158 P.2d 982] ; *Harris* v. *Joffe,* 28 Cal.2d 418, 427 [170 P.2d 454]), i.e., when contributory negligence is shown as a matter of law.

Unless it would have been negligent for plaintiff to elect the surface crossing in preference to a fully lighted subway, the presumption of due care simply cannot come into play. But to view that election as negligence is to establish that any pedestrian who crosses a street other than at a crosswalk is negligent per se. Such a rule disregards decision (e.g., *Shipway* v. *Monise, supra,* 59 Cal.App.2d 565, 571) and relieves a driver of his established continuing obligation to be vigilant and to exercise due care (*Biggar* v. *Carney, supra,* 181 Cal.App.2d 22, 28). I share my colleagues' concern for this plaintiff, but do not think it should blind us to the effects of this decision upon equally deserving pedestrians who, although exercising due care in negotiating a crossing, would be held negligent as

a matter of law for electing to commence the crossing at a point where the right of way must be yielded.

I would reverse the judgment.

Appellant's petition for a hearing by the Supreme Court was denied April 26, 1967. Peters, J., and Burke, J., were of the opinion that the petition should be granted.