Filed 6/27/24  O'Farrell v. City of San Diego CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| KERRI O'FARRELL, by and through her guardian ad litem, Sharon Justice,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CITY OF SAN DIEGO,<br><br>Defendant and Respondent. | D082324<br><br><br><br>(Super. Ct. No. 37-2020-00018662-CU-PO-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge.  Affirmed.

Gomez Trial Attorneys, John H. Gomez, Allison C. Worden, Mark S. Skeels, Max E. Halpern and Rachel M. Garrard for Plaintiff and Appellant.

Mara W. Elliott, City Attorney, M. Travis Phelps, Assistant City Attorney and Catherine A. Richardson, Chief Deputy City Attorney, for Defendant and Respondent.

INTRODUCTION

Kerri O'Farrell was struck by a car driven by Amir Huerta as she was crossing the intersection of Adams Avenue and 34th Street in the City of San

Diego (City) in an unmarked pedestrian crosswalk. O'Farrell sued the City, claiming the intersection constituted a dangerous condition of public property (Gov. Code,[1] § 835) and that the City failed to discharge its mandatory duties (§ 815.6) when it redesigned the intersection three years earlier.

The City moved for summary judgment, asserting the affirmative defense of design immunity (§ 830.6) barred liability under section 835, and that the mandatory duties alleged by O'Farrell did not give rise to liability. Agreeing with the City, the trial court granted the motion and subsequently denied O'Farrell's new trial motion. Finding no error with either ruling, we affirm the judgment in favor of the City.[2]

---

[1]    Undesignated statutory references are to the Government Code.

[2]    Although the judgment did not dispose of O'Farrell's claims against Huerta, whom she also sued, it is nevertheless final and appealable because it "leaves no issues to be determined as to [the City]." (*Dakota Payphone, LLC v. Alcaraz* (2011) 192 Cal.App.4th 493, 506.)

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Factual Summary*

On December 12, 2019, at approximately 6:45 p.m., Huerta was driving eastbound on Adams Avenue toward the intersection of Adams Avenue and 34th Street (intersection). The image below shows the intersection:



Adams Avenue had one eastbound lane, one westbound lane, and a middle two-way turn lane that divided the east and westbound lanes. The intersection had stop signs controlling north and southbound traffic on 34th Street, but there were no stop signs controlling east and westbound traffic on Adams Avenue.

At the time of the accident, the west leg of the intersection on Adams Avenue had a marked pedestrian crosswalk. As shown in the image, rectangular rapid flashing beacons (flashing beacons) were mounted on two posts, one at the north end and the other at the south end of this marked

3

crosswalk. There was also a pedestrian warning sign facing eastbound traffic 240 feet in advance of the marked crosswalk, as well as a "PED" "XING" pavement marking on the eastbound approach. The crosswalk on the east leg of the intersection on Adams Avenue was unmarked.

As Huerta approached the intersection, he entered the turn lane as if to turn left onto northbound 34th Street. Instead of turning, he stopped his car, got out, and appeared to yell angrily (or as one witness put it, he "road raged") at another driver who had stopped his car in the westbound lane of Adams Avenue. Huerta was outside his car for several seconds before he reentered his car and, with his tires squealing, continued through the intersection, eastbound on Adams Avenue.

Seconds before Huerta drove through the intersection, an unknown pedestrian activated the flashing beacons for the marked crosswalk at the intersection's west leg. O'Farrell was waiting to use the unmarked crosswalk at the east leg to walk north across Adams Avenue. She was standing at the curb on the southeast side of the intersection. She stepped into the roadway, paused as a car and then a motorcycle passed by, and continued walking north. At the same time, and while the flashing beacons were still flashing, Huerta drove east through the intersection, striking O'Farrell, who was then approximately 14 feet north of the south curb line.

After the accident, Huerta told police he did not remember whether the flashing beacons had been activated or not. He said it was "dark," O'Farrell had "darted in the street," and he had not seen her until the last second.[3]

---

[3]     In her opening brief on appeal, O'Farrell asserts that Huerta "did not know of the existence of a second crosswalk at the east leg[ ] and thus believed it was safe to proceed." Because she fails to demonstrate through appropriate record citations that this factual assertion is undisputed or has

4

O'Farrell suffered serious injuries, including a traumatic brain injury, as a result of the collision.

II.

*The City's Motion for Summary Judgment*

In her operative first amended complaint, O'Farrell asserted two causes of action against the City: (1) dangerous condition of public property (§ 835), and (2) breach of mandatory duty (§ 815.6). As to her cause of action for dangerous condition of public property, she alleged the east leg of the intersection (which she referred to as the "[c]rossing [l]ocation")) was a dangerous condition, including because the crosswalk at the east leg was unmarked, the installation of flashing beacons next to the marked crosswalk at the intersection's west leg made crossing at the east leg more dangerous, and the City failed to take measures to lessen the danger. As to her cause of action for breach of mandatory duty, O'Farrell alleged the City had removed previously existing crosswalk markings from the east leg of the intersection without public notice, in violation of a mandatory duty imposed by Vehicle Code section 21950.5.[4] She also alleged the City's installation of the marked crosswalk in the west leg of the intersection violated City Council Policy

---

evidentiary support, we disregard it. (See *Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 178, fn. 4.)

[4] "(a) An existing marked crosswalk may not be removed unless notice and opportunity to be heard is provided to the public not less than 30 days prior to the scheduled date of removal. In addition to any other public notice requirements, the notice of proposed removal shall be posted at the crosswalk identified for removal. [¶] (b) The notice required by subdivision (a) shall include, but is not limited to, notification to the public of both of the following: [¶] (1) That the public may provide input relating to the scheduled removal. [¶] (2) The form and method of providing the input authorized by paragraph (1)." (Veh. Code, § 21950.5.)

5

No. 200-07 (Policy No. 200-07), a policy governing the installation of marked crosswalks, because it assertedly was not preceded by a warrant study and because it lacked a horizontal deflection traffic calming treatment[5] ("traffic calming treatment").

The City moved for summary judgment, or alternatively, summary adjudication, on grounds (1) the intersection did not constitute a dangerous condition; (2) even if it did, the City had design immunity (§ 830.6); and (3) the cause of action for breach of mandatory duty lacked merit because the City's asserted failure to provide public notice pursuant to Vehicle Code section 21950.5 was not a proximate cause of the accident, and because the City did not fail to comply with mandatory duties imposed by Policy No. 200-07, nor was this policy an enactment upon which such a claim can be predicated.

The City presented evidence of the history of the installation of crosswalks and other improvements at the intersection. Before 2013, the intersection had no marked crosswalks. In 2013, in response to a citizen request for a marked crosswalk, the City performed a pedestrian count and warrants analysis pursuant to standards set forth in Policy No. 200-07. Through this study the City determined the intersection warranted a marked crosswalk. It installed a marked crosswalk at the east leg of the intersection in addition to advance pedestrian warning signs and "PED" "XING" pavement markings on the eastbound and westbound approaches.

In 2014, the City received a request to relocate the pedestrian warning signs, which were mounted on decorative acorn streetlights at the

---

[5]     A horizontal deflection traffic calming treatment is an improvement that deflects traffic horizontally (i.e., moves vehicles from right to left, or left to right, within the roadway) in order to reduce the speed of traffic.

intersection. It denied this request. In 2015, it received a request to install flashing beacons at the intersection. The City, using Policy No. 200-07 as a guide, determined the existing crosswalk qualified for flashing beacons and a traffic calming treatment (a pedestrian pop-out[6]), both of which were placed on the City's unfunded needs list for future installation.

The flashing beacons were subsequently approved for installation. In January 2017, the City received a request from Scott Kessler, executive director of the Adams Avenue Business Association, to relocate the existing marked crosswalk (including the planned flashing beacons) from the east leg to the west leg of the intersection. The City's documentation of this request stated the relocation would improve the visibility of the flashing beacon signs, create a pedestrian path connecting a parking lot with retail and commercial businesses, and allow decorative acorn streetlights to be void of signage. It further stated the proposed relocation had been discussed at a community planning committee meeting, and the chair of the committee had "confirmed that there was nothing but positive reaction for relocating the crosswalk."

Gary Pence, a senior traffic engineer with the City, approved the design of the intersection, including the relocation request. He signed work orders for the necessary signage and pavement striping as well as the installation of flashing beacons. The location was placed on the unfunded needs list for future installation of pedestrian pop-outs.

The City's civil and traffic engineer expert, Allen G. Bourgeois, opined that the design of the intersection was reasonable and appropriate and met

---

[6] A pedestrian pop-out was described by one of O'Farrell's expert witnesses as a permanent roadway feature that has the effect of reducing the pedestrian crossing distance.

7

or exceeded applicable standards. The City also presented a report showing that although there had been four prior pedestrian collisions at the intersection, they all occurred in or before 2015, when the intersection was differently configured. A deputy director for the Office of the City Clerk averred she had performed a search and had not located any records for the three years preceding O'Farrell's accident (January 1, 2017 to December 12, 2019) relating to any complaints of injuries, damage, accidents, or hazards associated with the streets, pedestrian crosswalks or lighting conditions at the intersection.

In opposition, O'Farrell argued the City's design immunity defense failed because Pence had not been given the authority to approve the intersection's design on behalf of the City. She also asserted the design of the intersection was unreasonable because it was approved without adequate study. And even if the City had design immunity, she argued it was independently negligent because the intersection created a concealed trap of which the City had failed to warn. Finally, O'Farrell argued the City was liable for failure to discharge mandatory duties. She asserted there was a triable issue of fact as to whether its failure to provide notice of removal of the marked crosswalk at the east leg of the intersection as required by Vehicle Code section 21950.5 was a proximate cause of the accident, and disagreed with the City's claim that Policy No. 200-07 was not an enactment within the meaning of Government Code section 815.6.

After sustaining several of the City's evidentiary objections, the trial court granted the motion for summary judgment. The court concluded the City had succeeded in establishing design immunity. It found no merit in O'Farrell's argument that the City failed to warn of a concealed trap, including because her claim that the flashing beacons distracted Huerta was

8

speculative.  Finally, it determined the City did not incur mandatory duty liability, reasoning O'Farrell could not establish the violation of Vehicle Code section 21950.5 was a substantial factor in causing her harm, and that Policy No. 200-07 did not require the City to conduct a second warrant study before it relocated the crosswalk in 2017.[7]  The court entered judgment against O'Farrell and in favor of the City.  Two months later, O'Farrell filed a motion for new trial, which the court denied.

DISCUSSION

I.

*Standard of Review on Summary Judgment*

"We review a summary judgment order de novo applying the same three-step process as the trial court.  First, we look to the pleadings to identify the elements of the causes of action.  Second, for a motion brought by a defendant, we examine the supporting evidence to determine whether it satisfies the moving party's initial burden of demonstrating that one or more elements cannot be established or there is a complete defense.  If so, we then examine the opposing evidence to determine whether the plaintiff has demonstrated the existence of a triable issue of material fact precluding summary judgment." (*Olson v. La Jolla Neurological Associates* (2022) 85 Cal.App.5th 723, 733 [cleaned up].)

---

[7]	The trial court's minute order did not explain the court's reasons for rejecting O'Farrell's claim that the City was liable for failing to comply with mandatory duties assertedly imposed by Policy No. 200-07.

II.

*Dangerous Condition of Public Property (§ 835)*

On our de novo review, we conclude the trial court properly granted summary judgment as to O'Farrell's cause of action for dangerous condition of public property against the City.

A.    *The City Established It Had Design Immunity*

A public entity can be held liable for creating a dangerous condition on its property.  (§ 835, subd. (a).)[8]  The statutory defense of design immunity under section 830.6,[9] however, precludes liability for injuries that were

---

[8]    Except as provided by statute, "a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either: [¶] (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or [¶] (b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."  (§ 835.)

[9]    "Neither a public entity nor a public employee is liable under this chapter for an injury caused by the plan or design of a construction of, or an improvement to, public property where such plan or design has been approved in advance of the construction or improvement by the legislative body of the public entity or by some other body or employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved, if the trial or appellate court determines that there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan or design or the standards therefor or (b) a reasonable legislative body or other body or employee could have approved the plan or design or the standards therefor."  (§ 830.6.)

allegedly caused by a defect in the design of a public improvement that was discretionarily approved by authorized personnel.

"[A] public entity claiming design immunity must establish three elements: (1) a causal relationship between the plan or design and the accident; (2) discretionary approval of the plan or design prior to construction; and (3) substantial evidence supporting the reasonableness of the plan or design." (*Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 69 (*Cornette*).) The trial court found the City succeeded in establishing all three elements of design immunity as a matter of law. O'Farrell contends the trial court erred in ruling in the City's favor as to the second and third elements only. We disagree.

1. *Discretionary approval*

Discretionary approval, the second element, "simply means approval in advance of construction by the legislative body or officer exercising discretionary authority." (*Ramirez v. City of Redondo Beach* (1987) 192 Cal.App.3d 515, 526 (*Ramirez*).) A public entity can establish the element by showing the design or plan was either "approved in advance of the construction or improvement by the legislative body of the public entity or by some other body or employee exercising discretionary authority to give such approval" (§ 830.6; see *Ramirez*, at p. 526); or alternatively, the design or plan was "prepared in conformity with standards previously so approved" (§ 830.6; see *Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 350 (*Hampton*)). This element may be resolved as a matter of law if the material facts pertaining to it are undisputed. (*Grenier v. City of Irwindale* (1997) 57 Cal.App.4th 931, 940 (*Grenier*).)

In its motion, the City sought to establish prior discretionary approval of the design of the intersection under both alternatives. O'Farrell contends

11

there are triable issues of fact precluding summary judgment as to each alternative. Because we conclude the trial court properly concluded that the City established the first alternative as a matter of law, we do not reach O'Farrell's arguments as to the second.

The City asserted in its summary judgment motion that Pence was acting "in his capacity as a delegee with discretionary authority to approve traffic engineering plans and designs for the City" when he approved the plan for the removal of the marked crosswalk at the east leg of the intersection, and the installation of the marked crosswalk and flashing beacons at the west leg of the intersection as well as all related signage. It relied on Pence's declaration in which he averred he was a licensed traffic engineer employed as a Senior Traffic Engineer for the City, and he had approved the design in his "capacity as a delegee with discretionary authority to approve traffic engineering plans and designs for the City." The City also relied on the declaration of Bourgeois, its civil and traffic engineer expert, who confirmed Pence signed the relevant work orders approving these design features.

In opposition, O'Farrell argued Pence was not authorized to approve the intersection on behalf of the City. She submitted a legal memorandum authored by a deputy City Attorney in 2002 on the subject of "Delegation of City Engineer's Duties" (legal memorandum). The legal memorandum reflected that it was prepared for the Director of the Engineering and Capital Projects Department for the purpose of answering several questions presented, including whether the City Engineer "may . . . designate others to act in [his or her] place as City Engineer, that is, create 'Deputy City Engineers?'" It stated the City Engineer did have such authority, and that "[u]nless [the City Engineer] circumscribe[s] a deputy's duties, once designated as Deputy City Engineers, each deputy can act in [the City

12

Engineer's] stead for all City Engineer duties.  For example, signing as Deputy City Engineer, they may approve plans and specifications for City improvements."

O'Farrell also submitted a November 2016 "Deputy City Engineer Designations" memorandum (November 2016 memorandum).  The November 2016 memorandum was authored by then City Engineer Marnell Gibson.  It stated Gibson was "hereby deputizing certain employees as shown on the [a]ttachment."  The attachment was a "[l]ist of [d]eputy [c]ity [e]ngineers."  It identified Pence as the sole employee delegated to "Act[ ] as the Traffic Safety and Operations Engineer."  Nine other employees were delegated the authority to "[r]eview[ ] and sign[ ] traffic engineering plans and specifications," and another 17 were granted authority to "[r]eview[ ] and sign[ ] construction and traffic control plans, specifications and record drawings prepared for City projects."  O'Farrell argued Pence lacked the authority to approve traffic engineering plans and designs because in the November 2016 memorandum this authority was expressly granted to others but not to Pence.[10]

---

10     In advancing this argument, O'Farrell relied in part on the declaration of Edward Ruzak, her traffic engineering expert, which contained his opinion that Pence lacked the authority to approve traffic engineering plans and designs on behalf of the City because in the November 2016 memorandum this authority was expressly granted to others but not to Pence.  However, the trial court sustained the City's objection to Ruzak's opinion for lack of foundation.  O'Farrell's appellate challenge to the trial court's ruling that Pence possessed the requisite design approval authority does not rely on the excluded evidence.  Although she separately appeals the court's evidentiary ruling, as we later explain, she fails to establish that the court abused its discretion.

13

In reply, the City submitted the declaration of James Nagelvoort, a former City Engineer who was copied on the November 2016 memorandum, to show Pence had been delegated the necessary authority to approve traffic work orders, plans, and designs on behalf of the City.[11] Nagelvoort, who had previously served as City Engineer from February 2012 until November 2016, and from October 2017 until April 2022, averred as follows: When he was City Engineer, he had authored two memoranda (one dated January 2016 and the other October 2017) designating Pence as "Acting as the Traffic Safety and Operations Engineer." This designation included the delegated authority to approve traffic engineering work orders, plans, and designs for the City. It was unnecessary to separately grant Pence the authority to "[r]eview[ ] and sign[ ] traffic engineering plans and specifications" or "review[ ] and sign[ ] construction and traffic control plans, specifications and record drawings prepared for City projects," because this authority was included in his designation as Traffic Safety and Operations Engineer.

In granting summary judgment, the trial court rejected O'Farrell's claim that it was a question of fact whether Pence had the necessary authority to approve the plans associated with relocation of the crosswalk. The court explained it was undisputed the City Engineer may deputize other properly qualified City engineers to approve discretionary projects. It reasoned that while O'Farrell argued Pence's designation failed to specify "what he is authorized to approve and therefore he must no[t] have authority to approve plans such as those at issue here, . . . this adverse inference is

---

[11]    The record does not reflect that O'Farrell objected to the City's reply evidence.

14

unsupported by the evidence which shows that Mr. Pence did have such authority."

On appeal, O'Farrell claims the trial court's ruling violated the principle that it must, on a motion for summary judgment, consider all of the evidence and all reasonably drawn inferences, and view the evidence in the light most favorable to the opposing party. (See Code Civ. Proc., § 437c, subd. (c).) She asserts "[t]he inference at issue here—that a document expressly authorizing 26 individuals, <u>but not Pence</u>, to review and sign plans did not intend to authorize Pence to review and sign plans—is reasonable."

We are not persuaded. The inference urged by O'Farrell is not reasonably deducible from the November 2016 memorandum. At the same time that it expressly delegated 26 individuals other than Pence to review and sign traffic plans, the memorandum also delegated Pence to act as the Traffic Safety and Operations Engineer. The November 2016 memorandum supports the inference Pence lacked the authority to approve traffic control plans on behalf of the City *only if one speculates* an acting Traffic Safety and Operations Engineer lacks that authority. A triable issue of fact cannot be created on the basis of speculation. (*Waschek v. Department of Motor Vehicles* (1997) 59 Cal.App.4th 640, 647 [" 'When opposition to a motion for summary judgment is based on inferences, those inferences must be reasonably deducible from the evidence, and not such as are derived from speculation, conjecture, imagination, or guesswork.' "].) Thus the trial court did not err.

O'Farrell also asserts that Nagelvoort's declaration "merely provides a convenient, post hoc explanation unsupported by the documentary evidence in the case." In her reply brief, O'Farrell asserts, without explanation, that Nagelvoort's declaration "is contrary to the memorandum" such that his

15

"opinion is a matter of credibility and a question of fact." We deem these assertions forfeited because they are undeveloped and unsupported by reasoned arguments or citation to authority. (See *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.) They are also meritless. We discern nothing in Nagelvoort's declaration that is "contrary to" the November 2016 memorandum. Rather, his declaration tended to explain the effect of the November 2016 memorandum by showing that materially identical memoranda using identical delegation language before and after November 2016 had the effect of delegating to Pence, as part of his authority to act as the Traffic Safety and Operations Engineer, the authority to approve traffic plans on behalf of the City. Nagelvoort's testimony is not in conflict with nor "contrary to" the November 2016 memorandum.

The trial court properly concluded the City established discretionary approval of the plan or design prior to construction, as a matter of law.

2. *Substantial evidence of the reasonableness of the intersection's design*

The third design immunity element, substantial evidence supporting the reasonableness of the design, always presents a question of law to be resolved by the court, not the jury. (*Cornette, supra*, 26 Cal.4th at p. 72.) The statute provides immunity when there is any substantial evidence of reasonableness, even if contradicted. (*Grenier, supra*, 57 Cal.App.4th at p. 940.)

The following principles govern summary adjudication of this element of design immunity. "[A]s long as reasonable minds can differ concerning whether a design should have been approved, then the governmental entity must be granted immunity. The statute does not require that property be perfectly designed, only that it be given a design which is reasonable under the circumstances." (*Ramirez, supra*, 192 Cal.App.3d at p. 525.) "Generally,

16

a civil engineer's opinion regarding reasonableness is substantial evidence sufficient to satisfy this element." (*Grenier, supra,* 57 Cal.App.4th at p. 941.) Further, when a government entity seeks to establish design immunity in the context of a summary judgment motion, "the normal rules governing a motion for summary judgment, and requiring its denial if any triable issue of fact appears, are not fully applicable[.]" (*Stufkosky v. Department of Transportation* (2023) 97 Cal.App.5th 492, 496–497 [cleaned up].) "For example, the defendant is not required to prove to the court that the design or plan was in fact a reasonable one. Instead, the defendant is merely required to adduce any substantial evidence that a reasonable public employee or legislative body could have approved the plan or design used under section 830.6. Thus, when the defendant files a motion for summary judgment, the existence of a possible conflict of evidence, as shown by the proof submitted on the motion, will not create a triable issue on this aspect of the defense that can defeat summary judgment." (*Id.* at p. 497 [cleaned up].)

To establish this element of its defense, the City relied on Bourgeois's declaration and on Pence's deposition testimony. Pence testified that his reasons for relocating the marked crosswalk to the west leg of the intersection were that the existing lighting was better on the west side; the relocated crosswalk would connect a parking lot to multiple businesses; and the relocation would permit removal of existing signage from the decorative acorn streetlights; and would serve to "channelize the pedestrians to the preferred crossing." He also testified that the warrant study conducted before the City installed the marked crosswalk at the east leg of the intersection had evaluated the intersection as a whole, and that a reevaluation of the intersection was not required by Policy No. 200-07.

17

Bourgeois averred the City had evaluated and upgraded the intersection on numerous occasions before the collision that injured O'Farrell. These included the 2013 request for pedestrian crosswalks, which prompted the City to conduct a pedestrian count and warrants analysis "per the standards set forth in . . . Policy [No.] 200-07." He also opined that: "The City's evaluation conformed to their established policy and the recommendation to install a marked pedestrian crossing at the subject intersection was reasonable and appropriate." Pence's reasons for relocating the marked crosswalk in 2017 were reasonable and appropriate. The signage, pavement markings, and installation of flashing beacons associated with the crosswalk's relocation also met the relevant requirements and standards of the operative California Manual on Uniform Traffic Control Devices (CA MUTCD). Bourgeois also averred that approving pedestrian pop-outs and then placing them on the unfunded needs list was consistent with the common practice of municipalities. In sum, it was his opinion the City had appropriately evaluated the pre-collision requests to improve the intersection and in doing so had "applied both City and State standards reasonably and appropriately" and that "the design of the intersection was reasonable and appropriate."

O'Farrell argued the design of the intersection was unreasonable because it was approved without adequate study. She proffered the declaration of Ruzak, a traffic engineer expert. Ruzak was critical of the intersection's design in numerous respects, although he did not opine that it failed to meet relevant CA MUTCD requirements and standards. He asserted that he did "not believe there is substantial evidence supporting the reasonableness of the plan or design" of the intersection. But he did not claim the City failed to conduct required studies.

18

The trial court ruled the City met its burden of demonstrating substantial evidence of the reasonableness of its design of the intersection. It found the City's evidence established the reasonableness of its decision to relocate the crosswalk from the east to west side and to add flashing beacons at the new crosswalk location, as well as its decision to have only one rather than two crosswalks at the intersection. It found that the City's evidence showed its initial warrant study evaluated both legs of the intersection,[12] and there was no evidence the City conducted further analyses or studies when a crosswalk "is relocated at an intersection that has already been determined to require a crosswalk."

On appeal, O'Farrell does not challenge the reasonableness of the City's design of the intersection or dispute whether it conformed to pertinent standards. Instead, citing *Hampton*, *supra*, 62 Cal.4th at pages 352 to 353, she contends the design was made without adequate study, and that a design made without adequate study necessarily lacks a reasonable basis for its approval. She argues the City failed to perform certain required studies, and as a result there is "no substantial evidence upon which a reasonable person could have approved the [i]ntersection's design." (Boldface omitted.) O'Farrell's arguments lack merit, for a number of reasons.

We first disagree with her apparent contention that *Hampton* stands for the proposition that adequate study and the reasonableness of the design decision are independent requirements that must be separately established

---

[12]  The trial court's minute order states, "The City has submitted evidence that the *crosswalk* as a whole was found to warrant a crosswalk, not the east or west side separately." (Italics added.)  It is obvious in context that the court meant to say "intersection" instead of the italicized "crosswalk."

19

for a government entity to qualify for design immunity. *Hampton* promulgated no such rule.

In *Hampton*, the California Supreme Court considered whether a government entity is required to establish, as a component of the discretionary approval element of its design immunity defense, that the employee who approved the design was aware of the relevant design standards and that the design deviated from those standards. (*Hampton*, *supra*, 62 Cal.4th at p. 343.) It concluded the discretionary approval element did not incorporate these requirements. (*Ibid*.) Instead, "the adequacy of the deliberative process with respect to design standards may be considered in connection with the court's determination whether there is substantial evidence that the design was reasonable." (*Ibid*.)

In so holding, our high court did not announce a rule that the third element of design immunity—substantial evidence supporting the reasonableness of the plan or design—has two independent components, adequate study and reasonableness of design. To be sure, it both quoted and discussed at length *Weiss v. Fote* (1960) 167 N.E.2d 63, a decision cited by the Law Revision Commission as the source of the rule set forth in section 830.6. (*Hampton*, *supra*, 62 Cal.4th at pp. 351–353.) And in one of the quoted passages, the *Weiss* court stated, " 'liability for injury arising out of the operation of a duly executed highway safety plan may only be predicated on proof that the plan *either* was evolved without adequate study *or* lacked reasonable basis.' " (*Hampton*, at pp. 352–353, quoting *Weiss*, at pp. 67–68.) In portraying *Hampton* as promulgating a rule that evidence of adequate study must be presented in order to obtain design immunity, O'Farrell relies on this passage.

20

Her reliance is misplaced. After quoting the passage from *Weiss*, our high court explained, "In our view, however, the [*Weiss*] court's alternating references to decisions made without adequate study and those lacking a reasonable basis for approval appear to be simply components of a broader reasonableness inquiry." (*Hampton*, *supra*, 62 Cal.4th at p. 353.) *Hampton* thus held that "[t]he issue of the adequacy of the deliberative process with respect to design standards *may* be considered in connection with the court's determination whether there is substantial evidence that the design was reasonable." (*Id.* at p. 343, italics added.) But *Hampton* did not hold that evidence of adequate study is necessary to establish design immunity, or that the failure to conduct ostensibly required studies will in every case defeat design immunity where the reasonableness of the resulting design is itself undisputed—as is the case in this appeal.

Second, even if we assume O'Farrell can challenge the trial court's resolution of the third element of design immunity by contesting the adequacy of the studies preceding the design decision (but not the reasonableness of the resulting design), her arguments still fail. Her contention is that the City abrogated its duties by failing to conduct certain studies. She does not, however, establish that additional studies were required.

Although O'Farrell refers broadly to the City's purported failure to conduct "a single safety study," her challenge boils down to the contention that the City violated Policy No. 200-07, which sets forth certain requirements, or "warrants," that must be satisfied in order for a location to qualify for a marked crosswalk as well as the crossing treatments needed. She argues the warrant study required by this policy was not conducted

21

before Pence approved relocation of the crosswalk in January 2017, and as a result, the City's design decision was insufficiently studied.

The record does not bear out O'Farrell's contention that Policy No. 200-07 was violated. The City's moving evidence established that a warrant study was conducted prior to the initial installation of the marked crosswalk at the east leg of the intersection. The evaluation form completed as part of this warrant analysis identified the Adams Avenue and 34th Street intersection as the studied location. Pence confirmed in his deposition that when conducting warrant studies, the City evaluates "the intersection as a whole." Further, Bourgeois opined that the study performed in connection with the installation of a marked crosswalk at the east leg of the intersection "conformed to their established policy." Although a second warrant study was not conducted before the marked crosswalk was relocated in January 2017, the trial court found this was unnecessary. It reasoned the City's evidence demonstrated its initial warrant study pertained to the intersection as a whole, "not the east or west side separately," and there was no evidence the City, "as a matter of policy or practice, conducts *further* analyses or studies when a crosswalk is relocated at an intersection that has already been determined to require a crosswalk." (Italics added.)

Rather than challenge the trial court's findings, O'Farrell quarrels with arguments raised in the City's summary judgment motion. She observes that the City argued Policy No. 200-07 was not triggered by the crosswalk's relocation. She claims the City did not relocate the marked crosswalk; it removed one marked crosswalk and installed another, and the new installation triggered the policy.

However, even if we assume Policy No. 200-07 applied to the crosswalk's relocation, O'Farrell does not establish that it was violated. Her

22

appellate arguments amount to vague insinuations of wrongdoing that fail to establish the existence of a triable issue of fact. For example, she asserts without explanation that the City's warrant study pertained only to an "adjacent" location. To the extent she means that the City's warrant study evaluated only the east leg but not the west leg of the intersection, she fails to support her assertion with a citation to relevant evidence. As we have explained, the trial court found the City's warrant study did not focus on only the east side of the intersection, and the City's evidence supports that finding. O'Farrell identifies no evidence to the contrary and thus fails to establish that a triable issue of material fact exists as to whether the prior study covered both legs of the intersection.

O'Farrell's only other effort to establish error is a bare assertion that Policy No. 200-07 requires the City to assess crosswalks "as they are installed." However, once again, she fails to support her assertion with a citation to relevant evidence. Her position is not grounded in the text of the policy, which does not set forth a time period when the warrant study supporting the installation of a particular marked crosswalk must be performed. She thus fails to establish that Policy No. 200-07 required the City to reevaluate the intersection before it relocated the crosswalk in 2017.

We reject O'Farrell's contention that no substantial evidence supports the City's 2017 design decision because the City failed to conduct required studies before approving the design. And O'Farrell does not otherwise challenge the reasonableness of the City's design of the intersection or dispute whether it conformed to pertinent standards. Thus the trial court properly found the City had established all three elements of its design immunity.

23

B.	*No Triable Issue of Material Fact That the City's Alleged Failure To Warn Proximately Caused O'Farrell's Injuries*

O'Farrell asserts that even if the City had design immunity, it was independently negligent because the design of the intersection created a concealed trap and the City failed to warn of dangers inherent in that design. We conclude O'Farrell fails to establish any triable issue of material fact as to this theory of liability under section 835, too.

We previously discussed that a public entity can be held liable for *creating* a dangerous condition on its property under subdivision (a) of section 835. Under subdivision (b) of section 835, a public entity may alternatively be held liable where " '[the] public entity had actual or constructive notice of the dangerous condition under section 835.2 a sufficient time prior to the injury to have taken measures *to protect* against the dangerous condition.' " (*Tansavatdi v. City of Rancho Palos Verdes* (2023) 14 Cal.5th 639, 652–654, italics added (*Tansavatdi*).) "The term 'protect against' is statutorily defined to include, among other things 'warning of a dangerous condition.' (§ 830, subd. (b).)" (*Id.* at p. 653.) And as our high court recently affirmed, where a public entity enjoys design immunity under section 830.6 for a dangerous condition, it "may nevertheless be liable for failure to warn of this dangerous condition where the failure to warn is negligent and is an independent, separate, concurring cause of the accident." (*Cameron v. State* (1972) 7 Cal.3d 318, 329, affd. in *Tansavatdi*, at p. 647.)

Thus a plaintiff seeking to impose liability for failure to warn of an immunized design element must prove three elements: (1) the public entity had actual or constructive notice that the approved design resulted in a dangerous condition; (2) the dangerous condition was a "concealed trap" within the meaning of section 830.8 to overcome that provision's signage

24

immunity; and (3) absence of a warning was a substantial factor in causing the injury. (*Tansavatdi, supra*, 14 Cal.5th at pp. 661–662.)

As to the second element of a failure to warn claim, section 830.8 provides government entities with immunity from liability "for an injury caused by the failure to provide traffic or warning signals, signs, markings or devices described in the Vehicle Code." (§ 830.8.) This is known as signage immunity. Section 830.8 also sets forth a "limitation to [signage] immunity . . . commonly referred to as the 'concealed trap' exception." (*Tansavatdi, supra*, 14 Cal.5th at p. 654.) It states: " 'Nothing in this section exonerates a public entity . . . from liability for injury . . . caused by such failure if a signal, sign, marking or device . . . was necessary to warn of a dangerous condition which endangered the safe movement of traffic and which would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care.' " (*Id.* at p. 654, quoting § 830.8.)

Relevant here, the third element of a cause of action for failure to warn of a concealed trap requires proof of causation: the plaintiff must "prove the absence of a warning [sign] was an 'independent, separate, concurring cause of the accident.' " (*Tansavatdi, supra*, 14 Cal.5th at p. 661.) The substantial factor test is employed because it is the test that applies " 'where concurrent independent causes contribute to an injury.' " (*Ibid.*; see *State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 352, fn. 12 (*State Hospitals*).) It "requires the plaintiff to 'show some substantial link or nexus between omission and injury.' " (*Tansavatdi,* at p. 661.)

As noted, in the trial court, O'Farrell sought to establish the City's design of the intersection created a concealed trap of which the City failed to warn. She submitted an expert declaration from Joellen Gill, a human factors expert, who opined there existed numerous cognitive factors that

25

"may have contributed" to Huerta's failure to predict and react to O'Farrell as she crossed the road; and the presence of the flashing beacons and immediate marked crosswalk at the west leg of the intersection tended to demand motorists' attention, resulting in "inattentional blindness to pedestrians beyond the west leg of the intersection." O'Farrell also relied on Ruzak's opinion that the intersection's design was dangerous, including because the flashing beacons contributed to the creation of a concealed trap.

Relying on her experts' declarations, O'Farrell argued the east leg of the intersection was unmarked, insufficiently lit, and obstructed by "numerous impediments," including the flashing beacons at the west leg of the intersection. She claimed the flashing beacons tended to "pull [drivers'] attention away from whatever hazards may be behind them, including in this case an unmarked crosswalk where pedestrians frequently cross" and gave pedestrians a false sense of security "regarding their right of way." She further argued the hazard posed by the flashing beacons was exacerbated by "the interplay of the roadway and its features," including "high vehicular and pedestrian traffic, the number of commercial driveways, visual distractions along the roadway, short traffic gaps," and other conditions, and that a reasonable jury could conclude "the flashing beacons, in combination with other roadway/crosswalk factors, created a trap."

The trial court rejected O'Farrell's concealed trap theory, finding her assertion the flashing beacons led Huerta to be distracted and gave her a false sense of security in crossing the road to be speculative and unsupported by the evidence. It observed that O'Farrell's own evidence included deposition testimony from a law enforcement officer who testified that after the incident, Huerta "did not remember if the yellow flashing pedestrian warning lights for the crosswalk on the westside of the intersection were

26

activated or not." It also noted that O'Farrell's evidence included witness testimony that O'Farrell appeared to have paused after stepping into the roadway, waiting for vehicles to pass her location, and stated this testimony showed O'Farrell was able to see oncoming traffic.

Citing *Thimon v. City of Newark* (2020) 44 Cal.App.5th 745 (*Thimon*) and *Sun v. City of Oakland* (2008) 166 Cal.App.4th 1177 (*Sun*), the trial court concluded there was nothing in the record creating a triable issue of fact as to the existence of dangers that would not be obvious to a pedestrian or driver exercising due care. (See *Thimon*, at p. 761 [finding no concealed trap where street "at, approaching and beyond the crosswalk was straight and level, without significant curves, elevation variances, blind corners or sight obstructions" such that "nothing prevented pedestrians from observing the volume of the oncoming traffic or its speed"]; *Sun*, at p. 1189 [discussing the need for unusual conditions or physical characteristics such as " 'blind corners, obscured sightlines, [or] elevation variances' " such that a road was " 'unsafe when used by motorists and pedestrians exercising due care' "].)

On appeal, O'Farrell again contends the flashing beacons, in conjunction with other roadway features such as the "overabundance" of commercial signs, dense vehicular and pedestrian traffic, and assertedly high motor vehicle speeds, created a concealed trap. Relying on Gill's declaration, she asserts the Adams Avenue roadway imposes a high mental workload such that motorists are inclined to experience either inattentional blindness (failure to notice even highly visible objects in the center of one's visual field) or tunnel vision (a myopic focus on the center of one's visual field such that information in one's peripheral vision goes unnoticed). She contends these "concepts . . . fortify" her position that the City's failure to warn of the

27

presence of pedestrians beyond the flashing beacons was a proximate cause of "Huerta's failure to predict and react to" O'Farrell's presence in the road.[13]

Like the trial court, we question whether the conditions identified by O'Farrell qualify as a concealed trap—which, as its name suggests, requires "a dangerous condition . . . 'which would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care.' " (*Chowdhury v. City of Los Angeles* (1995) 38 Cal.App.4th 1187, 1196–1197.) The exception has been applied to "accidents proximately caused when, for example, the public entity fails to post signs warning of a sharp or poorly banked curve ahead on its road or of a hidden intersection behind a promontory, or where a design defect in the roadway causes moisture to freeze and create an icy road surface, a fact known to the public entity but

---

[13] In her opening appellate brief, O'Farrell does not challenge the trial court's rejection of her theory that the flashing beacons created a trap from the perspective of a pedestrian like her by lulling her into a false sense of security. Any such challenge has therefore been forfeited. (*People v. Ashford University, LLC* (2024) 100 Cal.App.5th 485, 514 (*Ashford University*) [failure to raise an issue in the opening brief forfeits the issue on appeal].) The belated and undeveloped assertion in her reply brief that "there is evidence to suggest that both Huerta and O'Farrell were subjected to a trap," does not cure the forfeiture. (*Aviel v. Ng* (2008) 161 Cal.App.4th 809, 821 [disregarding belated attempt to develop arguments in reply brief]; *Maral v. City of Live Oak* (2013) 221 Cal.App.4th 975, 984 [an appellate court is not required to examine undeveloped claims].) The forfeited assertion also lacks merit. Because it is unaccompanied by record citations, O'Farrell fails to identify evidence contradicting the trial court's finding that witness testimony established her ability to see oncoming vehicles, such that the presence of the flashing beacons did not create a trap. (See *Thimon*, *supra*, 44 Cal.App.5th at p. 761 [no trap existed where assertedly dangerous roadway features did not prevent pedestrians from "observing the oncoming traffic"]; § 830.8 [liability for failure to warn exists for dangerous condition "which would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care"].)

not to unsuspecting motorists, or where road work is being performed on a highway." (*Id.* at p. 1197 [cleaned up].)  It has also been applied where an underground pedestrian subway was unlit and unsafe, unbeknownst to a driver.  (*Gardner v. San Jose* (1967) 248 Cal.App.2d 798, 804.)  It has been rejected, however, where the alleged hazardous condition—the presence of pedestrian bulb-outs—was "not hidden from pedestrians or motorists." (*Sun, supra*, 166 Cal.App.4th at p. 1193.)  Here, O'Farrell posits that the flashing beacons, in combination with other roadway features, created a concealed trap because they distracted motorists and violated driver expectations as to whether pedestrians would be crossing at the east leg of the intersection.  But the features plaintiffs rely upon were "not hidden from pedestrians or motorists." (*Ibid.*)  Further, "every warning sign necessarily directs a driver's attention to one thing among multiple things.  An accurate, reasonably placed warning sign does not create a dangerous condition just because it focuses a driver's attention on one roadway feature among many.  It remains the driver's duty to attend to the roadway as a whole." (*Mixon v. Pacific Gas & Electric Co.* (2012) 207 Cal.App.4th 124, 136.)

However, we need not decide whether the trial court correctly rejected O'Farrell's concealed trap theory, because we conclude she fails to establish a triable issue exists as to proximate causation.  The difficulty with O'Farrell's appellate arguments is that she fails to grapple directly with the trial court's conclusion—with which we agree—that her theory of liability for failure to warn of a concealed trap was speculative in light of the evidence Huerta did not recall whether the flashing beacons were activated.  "[A] plaintiff alleging failure to warn of a dangerous traffic condition must nonetheless overcome signage immunity by establishing the accident-causing condition was a concealed trap." (*Tansavatdi, supra*, 14 Cal.5th at p. 661.)  And to establish

29

liability for failure to warn of a concealed trap, the plaintiff must " 'show some substantial link or nexus between omission and injury.' " (*Ibid.*) Implicit in the trial court's ruling was the conclusion that O'Farrell failed to create a factual dispute with respect to the necessary element of proximate causation. The evidence identified by the trial court tended to refute the conclusion Huerta actually saw or had his visual attention captured by the flashing beacons, fatally undermining the claim the flashing beacons, whether alone or in combination with other factors, played a causal role, or indeed any role, in the accident. This, in turn, tended to negate the conclusion that there existed a substantial link between O'Farrell's injuries and the failure to mitigate the danger created by the purported trap through additional warnings.

The only evidence O'Farrell identifies as potentially creating a disputed issue of material fact on the required element of causation falls short of reaching that goal. Rather than cite evidence provided by percipient witnesses with personal knowledge as to whether Huerta actually saw and was distracted by the flashing beacons, O'Farrell relies on her experts' declarations.[14] Gill observed there was "a marked crosswalk with [flashing beacons] at the west leg of the subject intersection followed immediately by an unmarked crosswalk with no additional signals or warnings." She averred "[t]he lack of warning signs or other indicators regarding the potential

_____

[14] Portions of the Ruzak's and Gill's declarations were excluded from evidence by virtue of the trial court's ruling sustaining the City's objections. O'Farrell bases her appellate arguments about the merits of her concealed trap theory on the parts of the declarations that were not excluded, reserving her discussion of the excluded portions for her challenge to the court's ruling on the objections. We do the same and address the trial court's evidentiary rulings later in our opinion.

presence of pedestrians along the east leg likely violates driver expectations, since a driver proceeding through the intersection must do so without any salient visual cues as to whether a pedestrian might be crossing along the east leg. Thus, the City's failure to warn is a proximate cause of the injuries sustained in this case." Ruzak similarly averred the City's "failure to warn is a proximate cause of the injuries sustained in this case."

However, the experts' testimony fails to create a triable issue of material fact as to whether the City's failure to mitigate the danger assertedly created by the flashing beacons by installing additional warnings was a substantial factor in bringing about O'Farrell's injuries. Gill's averment that "[t]he lack of warning signs . . . *likely* violates *driver expectations*" is presented in the abstract, untethered to the facts of the collision in this case. It does not tend to demonstrate that the lack of additional warning signs played a substantial role in leading Huerta, specifically, to proceed through the intersection and collide with O'Farrell.

Further, Gill and Ruzak's assertions of proximate cause are legal conclusions. Although expert opinions "can assist courts," that assistance "cannot come in the form of a pure legal conclusion." (*Stack v. City of Lemoore* (2023) 91 Cal.App.5th 102, 116.) A bare conclusion of law is insufficient to create a triable issue of fact. (*Hoover Community Hotel Development Corp. v. Thomson* (1985) 167 Cal.App.3d 1130, 1137.) Consequently, O'Farrell does not establish that the trial court erred by concluding she failed to raise a triable issue of fact precluding summary adjudication of her alternative claim that the City was liable for failure to warn of a concealed trap.

31

III.

*Breach of Mandatory Duties (§ 815.6)*

Section 815.6, like section 835, creates a statutory exception to the usual rule of government immunity from tort liability.  It provides, "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."  (§ 815.6; see § 810.6 [" 'Enactment' means a constitutional provision, statute, charter provision, ordinance or regulation."].)  In order to establish a government entity's liability for breach of a mandatory duty, the plaintiff must establish "(1) a mandatory duty is imposed by an enactment, (2) the duty was designed to protect against the kind of injury allegedly suffered, and (3) breach of the duty proximately caused injury."  (*State Hospitals, supra,* 61 Cal.4th at p. 348.)

The California Supreme Court has expanded on the requirements of these elements of mandatory duty liability.  "First and foremost, application of section 815.6 requires that the enactment at issue be *obligatory*, rather than merely discretionary or permissive, in its directions to the public entity; it must *require*, rather than merely authorize or permit, that a particular action be taken or not taken."  (*Haggis v. City of Los Angeles* (2000) 22 Cal.4th 490, 498 (*Haggis*).)  " 'It is not enough, moreover, that the public entity or officer have been under an obligation to perform a function *if the function itself involves the exercise of discretion.*' "  (*State Hospitals*, *supra*, 61 Cal.4th at p. 348.)  Whether a particular enactment "is intended to impose a mandatory duty, rather than a mere obligation to perform a discretionary

function, is a question of statutory interpretation for the courts." (*Creason v. Department of Health Services* (1998) 18 Cal.4th 623, 631 (*Creason*).)

"Second, but equally important, section 815.6 requires that the mandatory duty be designed to protect against the particular kind of injury the plaintiff suffered. The plaintiff must show the injury is one of the consequences which the enacting body sought to prevent through imposing the alleged mandatory duty." (*Haggis*, *supra*, 22 Cal.4th at p. 499 [cleaned up].) This inquiry "goes to the legislative *purpose* of imposing the duty." (*Ibid*.)

Third, the breach of the duty must have been a proximate cause of the plaintiff's injury. (*Guzman v. County of Monterey* (2009) 46 Cal.4th 887, 898; *State Hospitals*, *supra*, 61 Cal.4th at p. 352; see *State Hospitals*, *supra*, at pp. 352–357 [trial court properly sustained demurrer to cause of action for breach of mandatory duties where proximate cause was absent as a matter of law].) "Ordinarily, proximate cause is a question of fact which cannot be decided as a matter of law from the allegations of a complaint. . . . Nevertheless, where the facts are such that the only reasonable conclusion is an absence of causation, the question is one of law, not of fact." (*State Hospitals*, at p. 353.)

O'Farrell asserts the City is liable for breach of its mandatory duties under section 815.6. She identifies two sources of the City's asserted mandatory duties: Vehicle Code section 21950.5 and Policy No. 200-07. We conclude, as the trial court did, that no triable issue of material fact exists as to this cause of action, under either theory.

A.     *Vehicle Code Section 21950.5*

Vehicle Code section 21950.5 provides, "An existing marked crosswalk may not be removed unless notice and opportunity to be heard is provided to the public not less than 30 days prior to the scheduled date of removal. In

33

addition to any other public notice requirements, the notice of proposed removal shall be posted at the crosswalk identified for removal." (Veh. Code, § 21950.5, subd. (a).)  It further provides the notice must include notification that the public may provide input relating to the scheduled removal as well as the form and method of providing the input.  (*Id.*, subd. (b).)

In her operative complaint, O'Farrell alleged the City breached its mandatory duty under Vehicle Code section 21950.5 by removing the existing marked crosswalk at the east leg of the intersection without first providing the public with notice and the opportunity to be heard.[15]  She alleged the City knew or should have known its omission would result in serious harm and injury to pedestrians, including herself.

For purposes of its summary judgment motion, the City did not dispute that it failed to provide the required statutory notice before it relocated the marked crosswalk from the east leg of the intersection to the west leg.  It argued there was no evidence the failure to provide notice was a proximate cause of the collision, and that O'Farrell's allegations were speculative to the

---

[15]  In her opening brief on appeal, O'Farrell identifies Policy No. 200-07 as a second authority requiring public notice before removal of a marked crosswalk.  However, Policy No. 200-07 simply incorporates the requirements of Vehicle Code section 21950.5 and makes it City policy to follow the requirements of this statute when a crosswalk is considered for removal. Although we conclude O'Farrell has forfeited reliance on Policy No. 200-07 as one of the enactments underlying her first theory of mandatory duty liability because she neither pled this theory in her operative complaint (*Lehto v. City of Oxnard* (1985) 171 Cal.App.3d 285, 292), nor argued it in her summary judgment opposition brief (*Bostrom v. County of San Bernardino* (1995) 35 Cal.App.4th 1654, 1663), O'Farrell's belated reliance on the policy makes no difference to the outcome of her appeal.  Because the policy simply incorporates Vehicle Code section 21950.5, this theory fails for the same reasons she fails to establish mandatory duty liability based on the City's alleged violation of Vehicle Code section 21950.5.

extent she contended that had the City provided the requisite notice, the public would have objected to the relocation, which would have prevented the collision and her resulting injuries. The City claimed the same theory had been considered and rejected in *Sun, supra,* 166 Cal.App.4th at page 1191.

The plaintiffs in *Sun* sued the City of Oakland after a driver struck and killed their decedent as she was attempting to cross a street in an unmarked pedestrian crosswalk. (*Sun, supra,* 166 Cal.App.4th at pp. 1180–1181.) The crosswalk had once been marked with painted stripes, but it was unmarked at the time of the accident. (*Id.* at p. 1181.) It was undisputed the city failed to provide the notice required by Vehicle Code section 21950.5 before it removed the crosswalk markings. (*Sun,* at p. 1191.) The city moved for summary judgment on the plaintiffs' claim the unmarked crosswalk was a dangerous condition of public property. (*Id.* at p. 1181.) The plaintiffs' opposition relied "heavily" on the city's failure to comply with Vehicle Code section 21950.5. (*Sun,* at p. 1186.) The trial court's grant of summary judgment was affirmed on appeal. Addressing the plaintiffs' reliance on Vehicle Code section 21950.5, the appellate court stated, "[Plaintiffs'] expert offered an opinion that had [the c]ity complied with this statute, community members would have opposed the removal and [the c]ity would not have removed the marked crosswalks. This conclusion is speculative. The statute does not require a public agency to take a specific course of action in response to public comment. Thus, . . . had [the c]ity complied with the statute it would have been free to remove the crosswalk markings even in the face of public opposition." (*Sun,* at p. 1191, fn. omitted.)

The trial court, relying on *Sun,* agreed with the City that O'Farrell's theory of causation was speculative. It stated that although O'Farrell's cause of action was asserted under section 815.6, "it makes no difference when

35

applying the analysis in *Sun*. Because the City was not required to act in any particular manner in response to public comments, [O'Farrell] is unable to establish that the City's failure to perform its duty was a substantial factor in causing Plaintiff's harm."

O'Farrell contends the trial court erred in two respects. First, she claims its reliance on *Sun* was improper. She contends *Sun* did not address the question whether the failure to provide notice of a crosswalk's removal could act as a substantial factor in causing the plaintiff's harm, and that the passage of *Sun* on which the trial court relied was merely dicta. Second, she claims proximate cause is a question of fact, and her opposition evidence established a triable issue of fact "regarding what might have been." We disagree.

First, proximate cause was squarely at issue in *Sun*. Section 835, the statute that was the basis of the *Sun* plaintiffs' suit, makes proximate causation a component of a claim for injuries based on a dangerous condition of public property. (See *Sun*, *supra*, 166 Cal.App.4th at p. 1183, quoting § 835 ["a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes . . . that the injury was *proximately caused* by the dangerous condition"]; see also CACI No. 1100 (Dangerous Condition on Public Property—Essential Factual Elements (Gov. Code, § 835)) [phrasing the proximate causation element of § 835 as requiring proof "the dangerous condition was a substantial factor in causing [the plaintiff's] harm"].) Consistent with this requirement, the plaintiffs in *Sun* opposed summary judgment on the ground there were disputed issues of material fact not only with respect to "whether the unmarked crosswalk was a dangerous condition," but also "*whether the dangerous condition was a concurrent cause of the accident.*" (*Sun*, at p. 1182, italics added.) Their opposition relied

36

"heavily" on Vehicle Code section 21950.5. (*Sun*, at p. 1186.) The trial court rejected their reliance on Vehicle Code section 21950.5, in part because they presented no evidence "Oakland's failure to comply with Vehicle Code [section] 21950.5 caused [the driver] to violate [other Vehicle Code provisions regulating drivers] in a grossly negligent manner, leading to decedent's death." (*Sun*, at p. 1186.)

The passage of *Sun* cited by the trial court here was also not dicta. In *Sun*, the trial court rejected the plaintiffs' reliance on Vehicle Code section 21950.5 on two alternative grounds, with the failure to demonstrate causation being one of those two grounds. (See *Sun*, *supra*, 166 Cal.App.5th at p. 1186.) The appellate court's discussion of the plaintiffs' theory of liability under Vehicle Code section 21950.5 tracked these alternatives, with each serving as an independent basis for the appellate court's decision to uphold the grant of summary judgment. (See *Sun*, at pp. 1191–1192.) "It is well settled that where two independent reasons are given for a decision, neither one is to be considered mere *dictum*, since there is no more reason for calling one ground the real basis of the decision than the other. The ruling on both grounds is the judgment of the court and each is of equal validity." (*Bank of Italy Nat. Trust & Sav. Assn. v. Bentley* (1933) 217 Cal. 644, 650.) The trial court in this case relied on the passage of *Sun* in which the appellate court affirmed the trial court's causation ruling. (See *Sun*, at p. 1191.) Because this was an independent ground for affirmance, the cited passage was not dicta.

Finally, even assuming O'Farrell's theory of liability could succeed given the right factual showing, she does not establish that she made such a factual showing. Although it is true proximate cause is ordinarily a question of fact, " 'where the facts are such that the only reasonable conclusion is an

37

absence of causation, the question is one of law, not of fact.' " (*State Hospitals*, *supra*, 61 Cal.4th at p. 353.) Courts have dispensed with causes of action for mandatory duty liability on proximate causation grounds as a matter of law where the alleged chain of causation posited "a subsequent unbroken series of discretionary findings" following the initial breach of mandatory duty. (*Id.* at pp. 352–357 [upholding reversal of trial court order overruling demurrer where the only mandatory duty alleged was the duty under the Sexually Violent Predators Act to use two evaluators to determine whether a parolee was a sexually violent predator, requiring the plaintiff to posit a subsequent unbroken series of discretionary findings]; see *Whitcombe v. County of Yolo* (1977) 73 Cal.App.3d 698, 707–708 [upholding demurrer to cause of action under § 815.6 based on county defendants' failure to keep and present probation reports; in view of the trial court's "latitude" in responding to such reports, it was "specious" to contend the plaintiffs' injuries were proximately caused by defendants' inactions].)

Here, O'Farrell contends a triable issue of fact exists as to what would have occurred had the City fulfilled its obligations under Vehicle Code section 21950.5. She asserts her opposition evidence "suggests both residents and [the community planning group] had complaints about the way the [i]ntersection was designed, [and] that City personnel had reservations about the decision to remove well-known markings from the east leg[.]" She concludes: "whether public notice would have prompted public comment or a strong opposition to the change, whether the City would have proceeded to remove the marked crosswalk nevertheless, and whether, at the very least, compliance with the statute would have put the community on notice of the dangers inherent in the design are all questions of fact to be decided by the jury at trial."

38

First, O'Farrell's effort to show a factually supported theory of causation falls short because it posits " 'cryptic, broadly phrased, and conclusory assertions' " as well as "mere possibilities," and thus is inherently speculative. (*Sinai Memorial Chapel v. Dudler* (1991) 231 Cal.App.3d 190, 196; accord *O'Neill v. Dake* (1985) 169 Cal.App.3d 1038, 1044–1045 (*O'Neill*) [an issue of fact cannot be created by "speculation, conjecture, imagination or guess work"].)

Second, to the extent O'Farrell cites record evidence to support her theory, the inference she attempts to draw from that evidence is speculative. The evidence she cites consists of email correspondence exchanged by Pence, a City traffic engineer who worked with Pence, a member of a community group who requested installation of flashing beacons at the intersection and other community stakeholders *before* the crosswalk was relocated, as well as deposition testimony about those email communications. Even if we assume these communications reflected complaints[16] or reservations about the removal of the marked crosswalk, these complaints had already been received, and any initial reservations overcome, by the time Pence approved the work order to remove the pavement markings on the east leg of the intersection. It is speculative to assume on the basis of the communications the City did receive that further, uncommunicated opposition existed. It is even more speculative to infer that the hypothetical communications of these unknown opponents would have led the City to change the intersection's design.

_____

16  We find within O'Farrell's opposition evidence very little indication of community complaints about the decision to remove the marked crosswalk from the east leg of the intersection.

39

For these reasons, we conclude the trial court did not err when it found O'Farrell could not establish the City's failure to perform its duty under Vehicle Code section 21950.5 was a substantial factor in causing her harm.

B.    *Policy No. 200-07*

Policy No. 200-07, the second alleged enactment, is a nine-page document that "provides the requirements uncontrolled pedestrian crossings must meet in order to be considered for a marked crosswalk" and "how a crosswalk must be marked." It identifies certain criteria termed "Basic Warrants" and "Points Warrants"[17] that "must be satisfied in order for an uncontrolled location to be considered for a marked crosswalk." (A location or crosswalk is considered "uncontrolled" if it is not controlled by a stop sign or a traffic signal.) Under the policy, if a location meets the basic warrants and scores a minimum number of points pursuant to the points warrants, it qualifies for, or "warrants," a marked crosswalk. The policy also identifies certain crossing "treatments," such as signage or flashing beacons, to be included with the marked crosswalk. Different crossing treatments are specified depending on the location's crossing distance and roadway vehicles per day; these factors determine whether the location falls into one of four categories (A, B, C, or D).

In her operative complaint, O'Farrell alleged the City determined the intersection warranted a designation of category "D." In association with category "D," Policy No. 200-07 provided that a traffic signal was required "if the CA MUTCD warrants are met and it is recommended by a traffic engineering study." Relevant here, it further provided: "Otherwise at least

---

17    For example, the "Basic Warrants" include pedestrian volume, approach speed, and other like criteria; the "Points Warrants" include such criteria as the average number of vehicular gaps per five-minute period.

40

one of the following is required:  [¶] . . . [¶] [h]orizontal deflection calming treatment with flashing beacons if the City of San Diego's Traffic Calming Guidelines are met."  (Fn. omitted.)  It explained that traffic calming treatments included "roundabouts, pedestrian refuge islands, and pedestrian pop-outs."

O'Farrell alleged the City violated Policy No. 200-07, and was liable under section 815.6, in two respects:  (1) by failing to install a traffic calming treatment in association with the 2017 relocation of the marked crosswalk from the east leg to the west leg of the intersection, and (2) by failing to conduct a new warrant analysis before making its relocation decision.  As we explain, neither theory supports her claim of liability under section 815.6.

1.    *Traffic calming treatment*

We conclude the City cannot be held liable under section 815.6 for its asserted failure to comply with Policy No. 200-07 by installing a traffic calming treatment.  Liability under section 815.6 exists only when "a mandatory duty is imposed by an enactment."  (*State Hospitals*, *supra*, 61 Cal.4th at p. 348.)  Whether a particular enactment "is intended to impose a mandatory duty, rather than a mere obligation to perform a discretionary function, is a question of statutory interpretation for the courts."  (*Creason, supra,* 18 Cal.4th at p. 631.)  Although the parties debate whether the policy constitutes an enactment within the meaning of section 815.6, we need not resolve this difficult question.  Instead, we conclude the policy, even assuming it qualifies as an enactment, does not eliminate the City's discretion with respect to the installation of traffic calming treatments.[18]

_____

[18]    Because the parties did not previously address whether Policy No. 200-07, in requiring traffic calming treatments, imposes a duty that is mandatory for purposes of section 815.6, we directed the parties to file supplemental

41

Whether a particular enactment creates a mandatory duty under section 815.6 generally depends on the language of the enactment. However, the use of obligatory language is not dispositive. "The enactment's language is, of course, a most important guide in determining legislative intent, but there are unquestionably instances in which other factors will indicate that apparent obligatory language was not intended to foreclose a governmental entity's or officer's exercise of discretion." (*Haggis*, *supra*, 22 Cal.4th at p. 499 [cleaned up].) "For example, the word 'shall' is 'mandatory' for purposes of the Welfare and Institutions Code. However, as we have emphasized, this term's inclusion in an enactment does not necessarily create a mandatory duty within the meaning of Government Code section 815.6." (*State Hospitals*, *supra*, 61 Cal.4th at p. 349 [cleaned up].) In *State Hospitals*, our high court summarized the distinction between a duty that is mandatory for purposes of section 815.6 and one that is not: "A mandatory duty is created only when an enactment requires an act that is clearly defined and not left to the public entity's discretion or judgment. Such an act is mandated only to the extent of the enactment's precise formulation. When

briefs addressing this point. They complied, and we have considered their arguments. With her supplemental brief, O'Farrell filed a request for judicial notice of Resolution No. R-309772, the resolution by which the City Council approved the operative version of Policy No. 200-07. She contends the resolution is relevant to "confirm[ing] the policy [i]s an enactment." We deny the request because we refrain from deciding whether the policy constitutes an enactment. (*Guarantee Forklift, Inc. v. Capacity of Texas, Inc.* (2017) 11 Cal.App.5th 1066, 1075 [An appellate court "may decline to take judicial notice of matters not relevant to dispositive issues on appeal."].) The request was also submitted after she filed her reply brief and on the same date the parties filed simultaneous supplemental letter briefs. The City therefore did not have the opportunity to respond to the new document. (*Lent v. California Coastal Com.* (2021) 62 Cal.App.5th 812, 855 [denial of judicial notice request proper where the party opponent has no opportunity to respond].)

the enactment leaves implementation to an exercise of discretion, lending itself to a normative or qualitative debate over whether the duty was adequately fulfilled, an alleged failure in implementation will not give rise to liability." (*State Hospitals*, at p. 350 [*cleaned up*].)

Applying this test to the relevant portions of Policy No. 200-07, we conclude fulfillment of its requirement to include a traffic calming treatment in the design of an uncontrolled crosswalk involves the exercise of engineering discretion and therefore cannot support a cause of action under section 815.6. Although the policy uses obligatory language and creates detailed "requirements" for uncontrolled pedestrian crossings, including the crossing treatments that are "required" depending on crossing distance and vehicles per day, it does not eliminate all engineering discretion. To the contrary, the policy's introductory summary states, "For unusual conditions not identified in this policy, *engineering judgment should be used* to apply these guidelines or adjust them to fit individual field site conditions. *These guidelines are not intended to be a substitute for engineering knowledge, experience or judgment.*" (Italics added.) This is a general statement of intent and the italicized language in it demonstrates the policy is intended to serve as a guideline. It does not eliminate engineering discretion even as to the design selections covered by the policy. The policy therefore cannot be construed as imposing design choices that are mandatory for purposes of section 815.6. (See *State Hospitals, supra*, 61 Cal.4th at p. 350 ["A mandatory duty is created only when an enactment requires an act that is clearly defined *and not left to the public entity's discretion or judgment*" (italics added)].) Moreover, because the language we have italicized is broad, we do not read the policy as limiting the use of engineering discretion to those

43

situations involving "[u]nusual conditions not identified in this policy" as O'Farrell urges.

*Tilton v. Reclamation Dist. No. 800* (2006) 142 Cal.App.4th 848 supports our construction of Policy No. 200-07.  In *Tilton*, the Court of Appeal construed virtually identical language in an engineering design manual promulgated by the U.S. Army Corps of Engineers to be fatal to the conclusion the manual created a mandatory duty for purposes of section 815.6.  (See *Tilton,* at p. 862 [no mandatory duty created by a manual that recited it was " '*intended as a guide for designing and constructing levees and not intended to replace the judgment of the design engineer on a particular project*' " (some italics added)].)  The same result obtains here.

The section of Policy No. 200-07 that governs crossing treatments lends further support to the conclusion it is not a vehicle for imposing liability under section 815.6.  Section 2.3.1 of the policy, "Crossing Treatment Thresholds" (underline omitted), states that once a crossing location is determined to meet the criteria for a marked crosswalk, "the next step is to *evaluate the most appropriate* crossing treatment(s) to be installed with the marked crosswalk."  (Italics added.)  It further states that the location types are divided into categories A, B, C, and D, depending on vehicle volume, speed, and crossing distance, "and are used to determine *the appropriate treatment* for the proposed marked crosswalk."  (Italics added.)  For locations in category D, the policy states that traffic calming treatments are required and that they "include, but are not limited to:  roundabouts, pedestrian refuge islands, and pedestrian pop-outs."  However, the policy neither instructs nor directs engineers on how to choose among the various options, necessarily leaving that choice to the discretion of the engineer.  The determination of the "appropriate" or "most appropriate" traffic calming

44

treatment for a location inherently requires the use of engineering judgment. (See *County of Los Angeles v. Superior Court* (2012) 209 Cal.App.4th 543, 550 ["what constitutes a 'hazard' " for purposes of a county code section "is an inherently subjective question which requires the exercise of considerable discretion"].)

The engineer tasked with selecting crosswalk treatments for a particular marked crosswalk therefore retains discretion to determine that a particular listed traffic calming treatment—here, a pedestrian pop-out—is the most appropriate treatment for a particular location, and to recommend its installation, which is what undisputedly occurred here.

O'Farrell acknowledges pedestrian pop-outs were recommended for the intersection's marked crosswalk. She claims, however, that the City is liable under section 815.6 because it placed them on the unfunded needs list, where they remained, or in her words "languish[ed]," when the accident took place. We disagree. First, the policy's introductory language supports the conclusion that the decision to include a particular crossing treatment in a marked crosswalk ultimately remains discretionary despite the use of obligatory language. The City cannot be liable under section 815.6 for failing to install treatments whose inclusion in a design is discretionary.

Second, the policy does not contain express timing requirements for the installation of selected treatments. Thus, a plain reading of the policy does not compel the conclusion that it imposes a mandatory duty to construct or install treatments within a particular time frame. (See *Nunn v. State of California* (1984) 35 Cal.3d 616, 625 [statute that mandated promulgation of standards but "did not expressly set a deadline for the issuance of the standards" did not lead to the conclusion the Legislature intended to impose a duty to prescribe the required regulations by a date certain].)

45

Third, although O'Farrell insinuates that the treatment has remained on the unfunded needs list for too long, she cites no evidence demonstrating what an appropriate length of time would be. Her unsupported assertion does not create a triable issue of fact. (*O'Neill*, *supra*, 169 Cal.App.3d at pp. 1044–1045.)

2. *Warrant study*

In its summary judgment motion, the City argued it was not liable under section 815.6 for the asserted failure to conduct a new warrant study prior to the 2017 relocation of the marked crosswalk. It claimed Policy No. 200-07 did not apply to the relocation of a marked crosswalk within an intersection, and that in any event it had conducted the warrant study required by the policy with its initial installation of the marked crosswalk at the east leg of the intersection and it was not required to conduct a second study. The trial court agreed, ruling the City previously conducted a warrant study in 2013 or 2014, "and no second study was necessary, even if the crosswalk was to be moved from the east to west side."

O'Farrell contends the trial court erred. She argues Policy No. 200-07 applied because the City did not "relocate" the crosswalk; it removed the crosswalk in place at the east leg of the intersection and installed a new crosswalk at the west leg. She further observes the policy applies to the installation of a crosswalk at an uncontrolled location, and the east and west legs of the intersection "were, and are, 'uncontrolled.' " This is the extent of her appellate arguments.

O'Farrell fails to meet her appellate burden of demonstrating error. (*Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 684.) The trial court did not rule that Policy No. 200-07 did not apply. Rather, it interpreted the policy as not requiring a second warrant study when a given

46

location has already been studied and found to warrant a marked crosswalk. O'Farrell fails to challenge the court's interpretation of Policy No. 200-07, which we find to be reasonable and consistent with the policy's text.

As we have noted, although the policy expressly requires the completion of a warrant study, it does not contain date requirements or provide that studies performed outside a particular time frame will not suffice. O'Farrell does not contend the analysis completed by the City in association with the initial installation of the marked crosswalk at the east leg of the intersection was inaccurate or that a new study would have garnered different results or necessitated a different outcome. She simply contends a warrant study was not performed between the time the marked crosswalk was initially installed at the east leg of the intersection and the time it was moved to the west leg. We conclude the trial court did not err by concluding the City did not fail to discharge its duty under the policy as a matter of law.

IV.

*Evidentiary Objections*

The City filed a total of 81 evidentiary objections challenging the admissibility of portions of O'Farrell's opposition evidence. As relevant here, objection nos. 1, 2, 9, 10, pertained to paragraphs 5, 6, 7(j), and 7(k) of Ruzak's expert declaration, and objection nos. 17, and 21 through 29 pertained to paragraphs 19, 31 through 34, and 36 through 40 of Gill's expert declaration. In each of these objections, the City identified at least one legal ground, and in most instances several legal grounds, why the challenged evidence was inadmissible. In its minute order granting the motion, the trial court sustained objection nos. 1, 2, 9, 10, 17, and 21 through 29 in whole, without limitation. O'Farrell contends the trial court erred in its evidentiary

47

rulings. We review the trial court's affirmative rulings on evidentiary objections for abuse of discretion, and no abuse appears on this record. (*Mackey v. Trustees of California State University* (2019) 31 Cal.App.5th 640, 657 [explaining the " 'weight of authority' " supports an abuse of discretion standard].)

A.    *O'Farrell Fails To Establish the Trial Court Erred by Sustaining Objection No. 1*

In objection no. 1, the City sought exclusion of paragraph 5 of Ruzak's declaration on the ground it lacked foundation because there was no evidence Ruzak was familiar with City Engineer designations or the duties of a deputy City Engineer acting as the traffic safety and operations engineer. In this paragraph, Ruzak averred that because the November 1, 2016 memorandum failed to expressly delegate to Pence the authority to review and sign traffic engineering plans or traffic control plans and specifications on behalf of the City, Pence lacked that authority.

O'Farrell contends the trial court abused its discretion by sustaining this objection because Ruzak's opinion was "based on his review of the evidence as well as his training, education, and expertise." We find no abuse of discretion. Ruzak asserted his opinion was based on the November 2016 memorandum and on his "training, education, and expertise." However, he did not describe any pertinent experience, special knowledge, or education relevant to interpreting the memoranda through which the City engineer delegates design approval authority. (See *Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1487 [expert declaration lacked foundation where the expert described "no experience, special knowledge or education" with respect to the subject matter of the expert's opinion].) Nor did his resume, which was attached to his declaration, reveal any special training, education, or expertise in the interpretation of City Engineer delegation

48

memoranda.  To the contrary, his resume showed a lack of prior experience working with the City.  We conclude the trial court did not err in sustaining the objection and impliedly concluding Ruzak's opinion lacked foundation.

B.      *Objection Nos. 2, 9, 10, 17, and 21 through 29*

Each of the City's remaining evidentiary objections asserted multiple grounds of inadmissibility.  By sustaining each objection in whole, the trial court impliedly incorporated within its ruling all grounds for exclusion asserted in the objection.  O'Farrell asserts the court erred in sustaining the objections and attempts to demonstrate that the objections lacked merit.  The difficulty with her effort to demonstrate error, however, is that it is incomplete.  Although each objection identified multiple grounds for exclusion, on appeal O'Farrell deals with only a subset of the asserted grounds, ignoring the rest.

For example, the City, in its objection no. 2, argued paragraph 6 of Ruzak's declaration should be excluded for three reasons:  Ruzak's averments lacked foundation, offered a legal conclusion, and were irrelevant.  On appeal, O'Farrell acknowledges the objections based on lack of foundation and relevance and presents arguments disputing the validity of these grounds.  However, she ignores that the City also asserted the averments were inadmissible legal conclusions.  She fails to explain why she disregards this additional ground for exclusion, even though the trial court impliedly found it meritorious when it sustained objection no. 2 in whole, without limitation.

O'Farrell's challenges to the trial court's sustention of the remaining objections follow the same pattern.  In its objection no. 9, the City sought exclusion of both paragraph 7(j) of Ruzak's declaration and the attached photographs on the ground they were irrelevant, lacked foundation, and were misleading and warranted exclusion under Evidence Code section 352.  Once again, the trial court sustained objection no. 9 in its entirety.  In her opening

49

brief, O'Farrell nevertheless characterizes the City's relevance objection as relating *only* to Ruzak's averments in paragraph 7(j), and the lack of foundation objection as pertaining *only* to the three attached photographs, when in fact both grounds for exclusion were asserted as to both pieces of evidence. And she simply ignores the Evidence Code section 352 objection. Again, she addresses fewer than all grounds for exclusion asserted by the City and impliedly embraced in the trial court's ruling, without acknowledging the other grounds were also asserted and without offering any reason for limiting her arguments.

Similarly, in objection no. 10, the City objected to paragraph 7(k) of Ruzak's declaration as relying on hearsay and as warranting exclusion under Evidence Code section 352. O'Farrell addresses the hearsay objection while ignoring the impliedly sustained objection pursuant to Evidence Code section 352.

The pattern continues in O'Farrell's challenges to objection nos. 17, and 21 through 29, which resulted in the exclusion of paragraphs 19, 31 through 34, and 36 through 40 of Gill's declaration. In objection no. 17 (likewise sustained in its entirety), the City sought exclusion of paragraph 19 as irrelevant, speculative, lacking foundation in evidence, falling outside Gill's area of expertise, and warranting exclusion under Evidence Code section 352. O'Farrell challenges the merits of the City's contentions that the evidence was irrelevant, speculative, and lacked foundation, while ignoring its arguments based on Gill's expert qualifications and Evidence Code section 352.

The City's objections nos. 21 through 24 (which, like the rest, were sustained *in toto*) asserted numerous grounds for exclusion of Gill's testimony in paragraphs 31 through 34, including that it lacked foundation, was

irrelevant, fell outside Gill's area of expertise, relied on hearsay, was vague as to time period, and should be excluded under Evidence Code section 352. O'Farrell addresses the foundation, hearsay, and vagueness objections, while ignoring the remaining grounds for exclusion argued by the City and impliedly found meritorious by the trial court.

Finally, in objection nos. 25 through 29, the City sought exclusion of Gill's testimony in paragraphs 36 through 40 on the ground it lacked foundation, was vague as to the referenced time period, was speculative, relied on hearsay, offered opinions for which she was not qualified, and merited exclusion under Evidence Code section 352. Although the trial court sustained the City's objections without limitation, on appeal O'Farrell nevertheless addresses only hearsay and speculation, ignoring the remaining grounds for exclusion without explanation.

It is O'Farrell's appellate burden to demonstrate error. (*Duarte v. Pacific Specialty Ins. Co.* (2017) 13 Cal.App.5th 45, 52.) Despite bearing this burden, O'Farrell addresses only some, but not all, of the multiple grounds for exclusion raised in each of the City's objections and impliedly incorporated in the trial court's ruling sustaining the objections. Moreover, she offers no explanation or reason for her decision to address only a subset of the proffered grounds, despite the fact that the trial court impliedly found all of the grounds to be meritorious. O'Farrell does not contend that the trial court issued an impermissible blanket ruling. (See e.g., *Nazir v. United Air Lines, Inc.* (2009) 178 Cal.App.4th 243, 255, 257 [trial court abused its discretion in sustaining all but one of defendants' 764 objections without explanation].) We deem any such argument to be forfeited. (See *Ashford University, supra*, 100 Cal.App.5th at p. 514.)

Rather, O'Farrell presents her arguments as though she is taking on the merits of the City's objections, but then addresses fewer than all grounds for exclusion without explaining the reason for the shortfall. It is not our role to speculate as to the reason O'Farrell has chosen to acknowledge only a subset of the grounds asserted in each objection, nor is it our role to independently evaluate the merits of the grounds she fails to address. Rather, it is her burden to overcome the presumption of correctness by presenting arguments that fully address all of the independent grounds underlying the trial court's ruling. (See Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2023) ¶ 8:17.1, p. 8-6; *Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 565.) Because she fails to meet her burden, we conclude the trial court's ruling on the objections is correct.

## V.

### *New Trial Motion*

Following entry of judgment, O'Farrell brought a motion for new trial. (Code Civ. Proc., § 657.) She raised numerous grounds for granting a new trial, including attorney misconduct amounting to an irregularity in the proceedings (*id.*, subd. (1)) and newly discovered evidence (*id.*, subd. (4)). We summarize only these two grounds, because they are the only ones relevant to her appeal.

In support of her motion, O'Farrell presented evidence that on February 6, 2023—three days before the trial court issued its minute order granting the City's summary judgment motion—her counsel took the deposition of Sonia Graciano, a City employee. Graciano was responsible for creating "service notifications," which appears to be a method of documenting incoming citizen communications or complaints. The notice of Graciano's

52

deposition included several document requests, including requests for the attachments to certain service notifications. Each of these requests, in addition to referencing a service notification number, also referenced a Bates-stamp number with the prefix COSD.

During the deposition, some 50 pages of documents were produced. Among these documents were citizen complaints about the intersection that were apparently contained in the requested attachments to service notifications. The complaints post-dated the subject collision and discussed the subject collision, and they included the names and addresses of the complainants. Counsel for the City stated on the deposition record that the City had produced "extensive responsive documents to closed [service notifications]" but acknowledged "there were in this particular case service notifications past the date of the accident . . . where some attachments had not been included in prior disclosures and were produced forthwith today."

Graciano was asked during the deposition about a spreadsheet she apparently created (although the spreadsheet was not included as an exhibit to O'Farrell's new trial motion). Graciano testified she did not remember how she generated the spreadsheet. She also testified she had not attempted to find documents responsive to two requests seeking complaints about the intersection.

O'Farrell argued the 50 pages of documents were new, the City's counsel should have produced them earlier, and the belated production entitled her to a new trial. She claimed that "[f]or years" she had sought to discover "information on prior . . . citizen complaints about conditions at or near the Intersection," in response to which the City had assertedly represented there was no evidence it had "actual notice of the alleged dangerous condition." O'Farrell asserted the production of documents at

53

Graciano's deposition showed "complaints received by the City post-accident" and thereby revealed "the potential existence of countless other pre-accident complaints." She suggested the City's counsel, through the assertedly belated production, had disobeyed "the rules of evidence . . . and the rule of law." The newly produced evidence was material, she argued, because in addition to including post-accident complaints, it included contact information for the complainants, and because Graciano had purportedly been disingenuous in testifying to a lack of recall about her ability to search for other documents. O'Farrell asserted that summary judgment is improper unless the moving party can establish the plaintiff cannot reasonably obtain needed evidence, and in light of Graciano's testimony it was clear O'Farrell could obtain needed evidence.

The City opposed the new trial motion, denied withholding evidence, and rejected O'Farrell's claim of attorney misconduct as unfounded. In support of its positions, it submitted the declaration of Catherine Richardson, a senior chief deputy city attorney and one of the attorneys of record for the City in this case. Richardson explained that Graciano was employed as a word processor, clerical assistant, and receptionist. To the extent the notice of Graciano's deposition requested attachments associated with particular service notifications, O'Farrell was provided those service notifications in October 2020 in response to written discovery, as evidenced by the Bates-stamp numbers included in O'Farrell's document requests to Graciano.

In preparation for her deposition, Graciano printed the requested attachments as well as the service notifications and provided them to the City's attorneys, including Richardson. To the extent the deposition notice also sought prior complaints about the design of the intersection, Richardson

averred the City had previously produced documents in response to this request and had no new documents to produce at Graciano's deposition.

According to Richardson, only nine pages of the documents, all consisting of the requested attachments to service notifications, were newly produced at Graciano's deposition. These nine pages of attachments and their associated service notifications had all been created *after* the subject accident in response to public contacts about the subject accident. They had "nothing to do with pre-accident complaints." Eight of the nine pages of attachments were associated with a single service notification and reflected contacts from employees of a salon located at a corner of the intersection. Richardson averred that O'Farrell had possessed this contact information for years, because the salon location was included in the service notification produced to her in October 2020. The remaining attachment reflected a contact from a former councilmember asking that the intersection be evaluated for safety; O'Farrell had possessed the service notification corresponding to this attachment since October 2020.

The trial court denied the new trial motion. Addressing O'Farrell's claims of attorney misconduct and newly discovered evidence, the court stated: "none of the newly produced documents require a different result than the one previously reached by the court. Post-accident complaints are irrelevant and [O'Farrell] has not provided any evidence that there were any pre-accident complaints withheld that would have put the City on notice that the new intersection design was dangerous."

An order granting summary judgment may properly be challenged by a motion for new trial. (*Doe v. United Air Lines, Inc.* (2008) 160 Cal.App.4th 1500, 1504.) However, the "[t]he right to a new trial is purely statutory[.]" (*Fomco, Inc. v. Joe Maggio, Inc.* (1961) 55 Cal.2d 162, 166.) The principal

statutory authority for granting a new trial is Code of Civil Procedure section 657, which identifies "[i]rregularity in the proceedings" and "[n]ewly discovered evidence" as grounds for modifying or vacating a prior ruling. (Code Civ. Proc., § 657, subds. (1), (4).) Attorney misconduct constitutes an irregularity in the proceedings that will justify a new trial. (*Los Angeles v. Decker* (1977) 18 Cal.3d 860, 870.) And a party may obtain a new trial on the basis of newly discovered evidence by establishing that "(1) the evidence is newly discovered; (2) he or she exercised reasonable diligence in discovering and producing it; and (3) it is material to the moving party's case." (*Plancarte v. Guardsmark* (2004) 118 Cal.App.4th 640, 646.) However, a new trial is statutorily authorized only if the grounds for a new trial exist and "materially affect[ ] the substantial rights of [the moving] party[.]" (Code Civ. Proc., § 657.)

"Generally, rulings on new trial motions are reviewed for an abuse of discretion. Nonetheless, in the case of an order denying a new trial following summary judgment, the determinations underlying the denial dictate our standard of review. To the extent the denial relies on the resolution of a question of law, including the nonexistence of triable issues of fact, we examine the matter de novo." (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1176 [cleaned up].)

Applying these principles, we conclude the trial court did not abuse its discretion by denying O'Farrell's new trial motion. The court rejected O'Farrell's request for a new trial because post-collision complaints are "irrelevant" and O'Farrell failed to produce evidence of withheld pre-collision complaints. We find the court's reasoning to be correct as well as consistent with the rule that to prevail on a claim for failure to warn of a dangerous traffic condition, the plaintiff must establish the public entity had notice of

56

the assertedly dangerous condition (*Tansavatdi*, *supra*, 14 Cal.5th at p. 662) "a sufficient time *prior to the injury* to have taken measures to protect against the dangerous condition" (§ 835, subd. (b), italics added).

O'Farrell's claims of attorney misconduct and newly discovered evidence were based on the assertedly belated production of documents at Graciano's deposition, and on Graciano's purported failure to either conduct additional document searches or explain how she would conduct them. However, the City established, and O'Farrell did not dispute, that only nine pages of the document production were new; all nine pages were attachments to service notifications already in O'Farrell's possession; and all of the newly produced attachments reflected complaints or inquiries about the intersection that the City received after O'Farrell was injured. Although Graciano testified she did not conduct other searches for complaints about the intersection, Richardson averred the City had already produced documents responsive to O'Farrell's request for complaints from 2013 through the present. And apart from eliciting that Graciano did not conduct additional searches or recall how to conduct them, O'Farrell's counsel did not ask Graciano follow up questions or elicit testimony tending to establish that further searches by her would have yielded previously undisclosed pre-accident complaints in the City's possession. O'Farrell's trial assertion that Graciano's testimony somehow revealed "the potential existence of countless other pre-accident complaints" was thus the product of speculation. "Speculation, however, is not evidence." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 864.) O'Farrell's showing did not tend to demonstrate that other new evidence existed aside from the nine pages of attachments produced during the deposition, all of which reflected post-collision complaints.

57

On appeal, O'Farrell does not quarrel with the trial court's reasoning. Instead, she asserts that summary judgment is improper "unless the moving party can establish 'that the plaintiff does not possess, and cannot reasonably obtain, needed evidence.'" (Underline omitted.) She further asserts that "[i]n light of Graciano's testimony, it is clear O'Farrell can obtain needed evidence, including by way of a genuine search for outstanding discovery." We are not persuaded. Although O'Farrell does not explain her assertions, we presume that by "outstanding discovery" she means further searches by Graciano for prior complaints about the intersection. As we have explained, however, O'Farrell's counsel did not elicit testimony from Graciano tending to indicate such a search would result in the discovery of additional, previously undisclosed pre-accident complaints received by the City. We therefore disagree that Graciano's testimony supports the conclusion O'Farrell "can obtain needed evidence" through "outstanding discovery."

## DISPOSITION

The judgment is affirmed. The City is entitled to its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)


DO, J.

WE CONCUR:


IRION, Acting P. J.


KELETY, J.

58